IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

WORLDNET TELECOMMUNICATIONS,
INC.,

     Plaintiff,

     v.

TELECOMMUNICATIONS
REGULATORY BOARD OF PUERTO
RICO, *ET AL.*,

     Defendant.

Civil No. 08-1360 (FAB/BJM)
08-1359 (FAB/BJM)

## OPINION AND ORDER

In these consolidated cases, which arises under the Telecommunications Act of 1996 (the

"Telecommunications Act" or "Act"), 47 U.S.C. § 251 *et seq*., the court is asked to review numerous

decisions made by  the Telecommunications Regulatory Board of Puerto Rico (the "Board" or

"TRB") approving or rejection provisions of an arbitrated interconnection agreement entered into

between telecommunications carriers Puerto Rico Telephone Company, Inc. ("PRTC") and

WorldNet Telecommunications, Inc. ("WorldNet").

Before the court are the parties' cross-motions for summary judgment.  The TRB moved for

summary judgment, attaching a statement of undisputed facts ("TRB's Fact Statement").  (Docket

Nos. 58, 59, 60).  PRTC also moved for summary judgment, attaching a statement of undisputed

facts ("PRTC's Fact Statement").  (Docket Nos. 61, 62, 63).  Finally, WorldNet moved for summary

judgment, attaching a statement of undisputed facts ("WorldNet's Fact Statement").  (Docket No.

64).  The parties each opposed the others' motions (Docket No. 71, 74, 75, 78), and PRTC replied

to the oppositions to its motion.  (Docket No. 84).  The TRB and WorldNet each indicated that they

did not dispute the opposing parties' Fact Statements.  (Docket No. 69, 70, 72).  PRTC opposed

TRB's and WorldNet's Fact Statements.  (Docket No. 76, 77).  The parties consented to my

jurisdiction (Docket No. 88), and the consolidated cases were referred to me for all proceedings,

including entry of judgment.  (Docket No. 89).

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

**I.      Telecommunications Act of 1996**

Congress enacted the Telecommunications Act, 47 U.S.C. § 251 *et seq.*, with the objective of creating competition in local telephone markets.  Previously, markets were controlled by "Baby Bell" carriers, spun off of American Telephone & Telegraph as part of the 1982 divestiture ending the national telephone monopoly.  AT&T Commc'ns of Ill., Inc. v. Ill. Bell Tel., 349 F.3d 402, 404 (7th Cir. 2003).   Under the Act, these former monopolistic owners are known as incumbent local exchange carriers ("ILECs" or "incumbent carriers), and new carriers attempting to enter the market are known as competitive local exchange carriers ("CLECs" or "competitive carriers").  In order for competitive carriers to enter the local telecommunications markets, it is necessary for them to have access to the existing telecommunications lines and infrastructure owned by the incumbent carriers. This access, known as interconnection, "allows customers of the competitor to place calls to, and to receive calls from, customers on the incumbent's network." WorldNet Telecomms., Inc., v. Puerto Rico Tel. Co., 497 F.3d 1, 3 (1st Cir. 2007) (hereinafter, "WorldNet I") (citation omitted).

The Act requires incumbent carriers to negotiate with any competitive carriers that request to negotiate an agreement, known as an interconnection agreement ("ICA").  If the parties are unable to successfully negotiate an ICA, either party may petition the state regulatory board to arbitrate the agreement.  47 U.S.C. § 252(b)(1).  The Act creates a dual regulatory scheme in which the Federal Communications Commission ("FCC") is the exclusive authority on certain aspects of the Act, while state regulatory boards ("state boards") are responsible for setting local pricing rules, reviewing generally-applicable terms and conditions, ensuring that all interconnection agreements comply with the Act, and acting as arbitrators, where necessary, in ICA arbitrations.  See, e.g., 47 U.S.C. §§ 252(b), 252(d), 252(e)(1), 252(f)(2).

A host of substantive provisions govern the terms of an agreement arbitrated pursuant to the Act, 47 U.S.C. § 252(c)(1), and a set of procedures govern the conduct of an arbitration under the

Act. 47 U.S.C. § 252(b). The Act requires incumbents to sell their services as "unbundled network elements" ("UNEs") to competitive carriers at non-discriminatory rates. In establishing rates, there is a tension between a competitive carrier's desire to purchase UNEs at rates allowing it to combine the elements and sell them at competitive retail rates, and an incumbent's desire to derive the same income from selling services to its competitors as it does from selling services to customers. AT&T Commc'ns of Ill., 349 F.3d at 404. These rates also affect each party's incentives to invest in creating or renovating facilities. Id. In implementing the Act, the FCC sought to address these tensions and incentives by directing carriers and state boards to set UNE rates using a forward-looking methodology known as "total element long-run incremental cost" ("TELRIC"). 47 C.F.R. §§ 51.505-515. Under TELRIC, prices are based on the long-run costs that would be incurred to produce services using the most-efficient technology presently available regardless of whether the incumbent carrier actually uses the most up-to-date technology. AT&T Commc'ns of Ill., 349 F.3d at 404-05.

In addition to these various substantive requirements, the Act sets forth the procedures a state board must follow in reviewing and approving interconnection agreements. The Act requires the state board to make a determination within nine months of the date the ILEC received the CLEC's request to negotiate. 47 U.S.C. § 252(b)(4)(C). The Act requires that the state board review both negotiated and arbitrated ICAs and either "approve or reject" the agreement with written findings detailing any deficiencies. 47 U.S.C. § 252(e)(1). In the case of arbitrated agreements, the commission may reject an agreement only for limited reasons: (1) the agreement is inconsistent with the requirements of the Act set forth in 47 U.S.C. § 251 or § 252(d), or the Act's implementing regulations, or (2) the agreement conflicts with other requirements of state law. 47 U.S.C. §§ 252(e)(2)(B), 252(e)(3). If either party is dissatisfied with a state board's determination, that party may file an action in an appropriate district court to review whether the board's determination meets the requirements of the Act. 47 U.S.C. § 252(e)(6). If the state board fails to approve or reject the

agreement within thirty days after it is submitted by the parties, the ICA is deemed approved and ripe for federal judicial review.  47 U.S.C. § 252(e)(4).  Moreover, if the state board fails to take any action to comply with its obligations under the statute, the FCC may intervene.  47 U.S.C. § 252(e)(5).

## II.     Proceedings in this Case

PRTC, an incumbent carrier, provides local and long distance telephone services throughout Puerto Rico.  (Docket Nos. 63, ¶ 1; 64-3, ¶ 2).  WorldNet, a competitive carrier, also provides local and long distance telephone services in Puerto Rico.  (Docket Nos. 63, ¶ 2; 64-3, ¶ 2).  The TRB is a state board, as defined by the Telecommunications Act.  (Docket No. 63, ¶ 3).  In October 2006, WorldNet formally requested interconnection agreement negotiations with PRTC.  (Docket No. 59, ¶ 3).  After engaging in negotiations with PRTC for various interconnection terms, WorldNet filed a Petition for Arbitration with the TRB on March 7, 2007, requesting that the Board resolve 374 issues then outstanding.  (Docket Nos. 63, ¶ 4; 59, ¶ 4).  The Board thereby opened an arbitration proceeding, which was assigned Case Number JRT-2007-AR-0001.  (Docket No. 63, ¶ 5).  The parties resolved many of their disputed issues, and approximately 200 issues were submitted to the arbitrator.  (Docket No. 59, ¶ 10, 11).  In advance of the arbitration, the parties submitted over 1,000 pages of pre-filed direct and rebuttal testimony from a combined total of twenty fact witnesses and eight expert witnesses.  (Docket No. 59, ¶ 12-14).  From May 22-25, 2007, the parties participated in a hearing consisting of opening statements, cross-examination of fact and expert witnesses, and closing arguments.  (Docket No. 59, ¶ 15).  Following the hearing, the parties submitted extensive post-hearing briefs addressing the open issues that needed to be resolved by the arbitrator.  (Docket No. 59, ¶ 16).

On July 2, 2007, the arbitrator issued a ruling resolving approximately 200 outstanding issues.  (Docket No. 59, ¶ 17).  In compliance with the requirements of Section 252(e)(1), the parties jointly submitted the resulting arbitrated interconnection agreement (the "Agreement") to the Board

for its approval.  (Docket No. 63, ¶ 7).  On November 2, 2007, the Board issued an order approving

the Agreement in its entirety.   (Docket No. 63, ¶ 8).   WorldNet and PRTC each sought

reconsideration of the Board's approval as to certain portions of the Agreement, and on February 25,

2008, the Board issued a ruling addressing approximately sixty issues raised in these motions.

(Docket Nos. 63, ¶ 9; 59, ¶ 21).  For eight pricing issues, the Board determined that neither party had

proposed TELRIC-compliant rates, and thereby adopted interim rates and scheduled a follow-on

hearing to determine the rates.  (Docket No. 59, ¶ 22, 23).  The Board conducted the follow-on

hearing and issued a ruling on those issues on August 8, 2008.  (Docket No. 63, ¶ 10).   Next,

WorldNet and PRTC each sought reconsideration of the August 8 ruling, and the Board ruled on

these motions on November 10, 2008.  (Docket No. 63, ¶ 11).  The parties then submitted a First

Amendment to the Agreement to the Board for its approval.  (Docket No. 63, ¶ 13).  The parties have

provided the record from the arbitration proceedings (containing 116 separate documents) to the

court in a Joint Appendix in CD-ROM form   (Docket Nos. 59, ¶ 28; 65), and have provided

additional documents in a Supplemental Joint Appendix (Docket No. 85).[1]

## DISCUSSION

### I.     Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(c).  A fact is material only if it "might affect the outcome of the suit under

the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining if

a material fact is "genuine," the court does not weigh the facts but instead ascertains whether the

"evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; Leary

---

[1] References to the Joint Appendix, filed under seal with the court, are denoted as (JA, Ex. __, p.
__).  The page numbers refer to the pages of the PDF files, which may differ from the numbering of the
underlying documents contained therein.

v. Dalton, 58 F.3d 748, 751 (1st Cir. 1995).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [evidence] ... which it believes demonstrate the absence of a genuine issue of material fact." Crawford-El v. Britton, 523 U.S. 574, 600 n.22 (1998) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). Once this threshold is met, the burden shifts to the nonmoving party. The nonmovant may not rest on mere conclusory allegations or wholesale denials. Fed. R. Civ. P. 56(e); Libertad v. Welch, 53 F.3d 428, 435 (1st Cir. 1995). Instead, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial" and support such facts with "affidavits... made on personal knowledge ... set[ting] forth such facts as would be admissible in evidence." Fed. R. Civ. P. 56(e). Further, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Of course, the court draws inferences and evaluates facts "in the light most favorable to the nonmoving party." Leary, 58 F.3d at 751.

Summary judgment is particularly appropriate for this administrative appeal on a closed administrative record. Courts have concluded that in disputes related to interconnection agreements under the Act, "the record created by the state utility commission is closed for the purposes of review." Bell Atlantic-Delaware, Inc. v. Global NAPS South, Inc., 77 F. Supp. 2d 492, 502 (D. Del. 1999). See also MCI Telecomms. Corp. v. New York Tel. Co., 134 F. Supp. 2d 490, 500 (N.D.N.Y. 2001) ("this Court agrees that it is limited to the record created by the state utility commission when reviewing disputes related to interconnection agreements issued under [the Act]"); MCI Telecomms. Corp. v. Ohio Bell Telephone Co., 279 F. Supp. 2d 947, 954 (S.D.Ohio 2003) ("[u]nder the provisions set forth in the Act for judicial review, it is most inappropriate for a district court to review matters which have not been fully presented to the Commissioners").

**II.          Analysis**

    **A.          Standard of Review**

State agency determinations resting principally on an interpretation of federal law are subject to *de novo* review by federal courts, and are not accorded the deferential review reserved for reviews of federal agencies interpreting their own rules and regulations.  Global NAPs, Inc., v. Verizon New England, Inc., 444 F.3d 59 (1st Cir. 2006).  Specifically, in reviewing an arbitrated agreement under the Telecommunications Act, a court reviews *de novo* whether the agreement is in compliance with the Act and implementing regulations.  U.S. West Commc'ns, Inc., v. Wash. Utils. and Transp. Comm'n, 255 F.3d 990, 994 (9th Cir. 2001).  However, a federal court reviews the state agency's decisions as to matters of fact, policy, and application of general standards under an arbitrary and capricious standard.  WorldNet I, 497 F.3d at 5, U.S. West Commc'ns, Inc., 255 F.3d at 994.  While not articulating a position itself, the First Circuit has noted, "other Circuits have held that where no error of law exists, the state agency's other determinations are reviewed under the arbitrary and capricious standard."  Global NAPS, Inc. v. Verizon New Eng., Inc., 396 F.3d 16, 23 (1st Cir. 2005) ("Global NAPs I") (citing Southwestern Bell Tel. Co. v. Waller Creek Commc'ns, Inc., 221 F.3d 812, 816 (5th Cir. 2000);  MCI Telecomms. Corp. v. Ohio Bell Tel. Co., 376 F.3d 539, 548 (6th Cir. 2004); US West Commc'ns v. MFS Intelenet, Inc., 193 F.3d 1112, 1117 (9th Cir. 1999); U.S. West Commc'ns, Inc. v. Sprint Commc'ns Co., 275 F.3d 1241, 1248 (10th Cir. 2002)).  In the absence of any contrary First Circuit authority, the court will apply this widely-used standard.

Nevertheless, a different standard applies when the Board is interpreting the Puerto Rico Telecommunications Act of 1996, commonly known as Law 213.  27 L.P.R.A. § 265 *et seq.*  In that situation, the court should give deference to the Board as the agency charged with administering Law 213.  WorldNet I, 497 F.3d at 11 (discussing Law 213 and noting, "[a]lthough the Board's authority under local law is a legal issue, it is customary where any doubt exists to give some deference to the agency charged with administering the statute").  See also Antilles Cement Corp. v. Acevedo Vila,

408 F.3d 41, 51 (1st Cir. 2005) ("the administrative interpretation given to an act by the [Commonwealth] agency in charge of enforcing it deserves great weight and deference") (alteration in original) (quoting Zambrana Torres v. Gonzalez, 145 D.P.R. 616, 638 (1998)); Pharm. Research & Mfrs. of Am. v. Concannon, 249 F.3d 66, 75 (1st Cir. 2001) (noting that "[a]s the [state agency] is charged with administering the [state program], we owe deference to its interpretation of the [state statute]"); Fitch v. PUC, 261 Fed. Appx. 788, 791 (5th Cir. 2008) ("state law determinations by state commissions are reviewed under the more deferential arbitrary and capricious standard") (internal quotation omitted); Mich. Bell Tel. Co. v. MFS Intelenet of Mich., Inc., 339 F.3d 428, 433 (6th Cir. 2003) (noting the "inherent logic of . . . allowing state agencies wider deference in state law determinations").

However, in those cases where the Board overturns the arbitrator's decision, a "further wrinkle exists" in the analysis. WorldNet I, 497 F.3d at 5. As discussed above, the Act provides that either party may petition the state board to arbitrate any open issues. 47 U.S.C. § 252(b)(1). Upon petition, the state board may request further information from the parties to assist it in making a decision. 47 U.S.C. § 252(b)(4). When an agreement is arbitrated, the state board must "approve or reject" the agreement within thirty days of its submission. 47 U.S.C. §§ 252(e)(1), 252(e)(4). In exercising these two options, the state board may reject an arbitrated agreement only if it finds that the agreement does not hold the carriers to their obligations under section 251, or fails to meet the pricing standards of section 252. 47 U.S.C. §§ 252(e)(2)-(3), WorldNet I, 497 F.3d at 5-6. The TRB may also impose other requirements of Puerto Rico law so long as they are not inconsistent with the statute. WorldNet I, 497 F.3d at 6.

The First Circuit explained in reviewing the previous WorldNet and PRTC agreement that when the TRB decides to delegate its authority to arbitrate an agreement to an independent arbitrator - as it did here - the Act limits the TRB's options to either accepting or rejecting the resulting agreement. WorldNet Telecomms., Inc. v. Puerto Rico Tel. Co., 497 F.3d 13 (1st Cir. 2007)

(hereinafter, "<u>WorldNet II</u>") (denying rehearing of <u>WorldNet I</u>).  In other words, the TRB should treat an arbitrated agreement as a "*presumptive* solution" which it "must" accept if it is consistent with the statute, "*unless*" the TRB "reasonably" finds that the arbitrated agreement conflicts with Puerto Rico law, TRB rules, or the TRB's "considered policy determinations".  <u>WorldNet I</u>, 497 F.3d at 7 (original emphasis).  A federal court reviewing the board's decision must accordingly look beneath the surface of the board's decision to analyze whether it is in fact "reasonable."  <u>WorldNet I</u>, 497 F.3d at 6-7 (analyzing state and federal law and concluding that there was no support for TRB's assumption that liquidated damages provision was improper).   Therefore, when the TRB overturns a decision of the arbitrator, the question is whether the TRB reasonably found that the Arbitrator's determinations were inconsistent with the statute or conflicted with one of the other referenced bodies of law and policy.

> **B.    Disputed Issues**

> > **1.    Liquidated Damages**

PRTC challenges the Board's affirmance of the arbitrator's decision to include a provision in the agreement for liquidated damages.  (Docket No. 62, p. 17).  The arbitrator adopted a modified version of WorldNet's proposed provision imposing liquidated damages on PRTC if it failed to meet specific performance obligations in the Agreement.  (JA, Ex. 92, p. 28).  The Board affirmed the arbitrator's decision, finding that (1) the arbitrator's decision did not violate Law 213; (2) the general principles of Puerto Rico law and policy, as construed by the First Circuit in <u>WorldNet I</u>, are not violated by a liquidated damages clause; (3) there was sufficient evidence in the record for the arbitrator to conclude that the liquidated damages provision should be adopted and did not provide for excessive damages; and (4) as a matter of policy, liquidated damages provide appropriate, pro-competitive incentives to PRTC.  (JA, Ex. 92, p. 31-36).

PRTC argues that the Board's decision violated law and exceeded the Board's legal authority, and that the decision was arbitrary and capricious.  In particular, PRTC argues that (1) the Board's

WorldNet Telecomms. v. Telecomms. Regulatory Board of Puerto Rico, et al.                    Page 10
Civil No. 08-1360 (FAB/BJM)
**OPINION AND ORDER**

decision violated Law 213, as construed by the Puerto Rico Supreme Court in Caribe Commc'ns v.
Puerto Rico Tel. Co., 157 D.P.R. 203 (2002), and 27 L.P.R.A. § 269j-1, as amended, which
precludes the Board from awarding damages payable from one telecommunications carrier to
another; and (2) no support for the Board's decision can be found in federal law, which does not
permit the imposition of liquidated damages when such an imposition conflicts with state law.
(Docket No. 62, p. 11- 17).  PRTC also argues that Puerto Rico law further prohibits the awarding
of punitive damages (p. 17-23), and that the Board acted arbitrarily and capriciously in failing to
appropriately address an issue of spoliation of evidence relating to liquidated damages (p. 23-26).

        WorldNet argues that the Board's decision was (1) consistent with both Puerto Rico and
federal law; (2) not contrary to Puerto Rico law concerning punitive damages; and (3) not arbitrary
and capricious because PRTC's spoliation argument misstates the record.  (Docket No. 74, p. 8-23).
Finally, the Board argues that its decision to adopt the liquidated damages provision in the
Agreement was based on controlling First Circuit precedent, citing WorldNet I, 497 F.3d at 7.
(Docket No. 60, p. 36).

        This court reviews the Board's decision on the legal issue *de novo* and the factual and policy
decisions under an arbitrary and capricious standard.  However, the court reviews the Board's
interpretation of Puerto Rico law with deference.  Initially, it is difficult to find fault with the Board's
decision-making on this matter.  In its review of the previous WorldNet-PRTC agreement, the Board
rejected a liquidated damages provision included in the arbitrated agreement.  WorldNet I, 497 F.3d
at 5.  The First Circuit, in no uncertain terms, found the Board's decision incorrect as a matter of
both procedural and substantive law.  Id., at 6-8.  The court instructed the Board that "neither the Act
nor Puerto Rico precedent forbids incentive-based liquidated damages . . . [and] the Board should
not assume an inability to use cost-based liquidated damages."  Id., at 8.  The court instructed that,
on remand, the Board could continue to set aside the arbitrator's award only if "it violates *general*
agency policy".  Id. (original emphasis).  Accordingly, this time the Board took care to follow these

clear First Circuit instructions, affirming the arbitrator's award as consistent with state and federal law, as well as its own policies. Likewise, the arbitrator noted, "I am confused by the PRTC argument because it appears to challenge the holding of [WorldNet I]", and she proceeded to rely on WorldNet I as "the law of the First Circuit". (JA, Ex. 85, p. 30).

Nevertheless, PRTC contends that the Board erred as a matter of law because Puerto Rico law prohibits the Board from awarding liquidated damages payable from one telecommunications carrier to another. (Docket No. 62, p. 11). The parties cite: (1) a Puerto Rico Supreme Court case, Caribe Commc'ns, Inc., 157 D.P.R. 203, concerning the jurisdiction and powers of the TRB; (2) the legislative history for 27 L.P.R.A. § 269j-1 indicating that it was passed in response to Caribe Communications in order to "clarify" that the Board was "granted express authority to estimate and grant compensation for damages and losses caused", Laws of Puerto Rico, Act. Nov. 4, 2005, No. 138, Statement of Motives; and (3) Section 269j-1 itself, which purports to grant authority to the TRB to adjudicate claims for damages "caused by any natural or juridical person to a user". 27 L.P.R.A. § 269j-1.

It is not clear that this set of laws prevents the Board from including or enforcing a liquidated damages provision in arbitrated agreements. As WorldNet correctly observes, there is "a crucial distinction between the Board as an adjudicator of claims for money damages and the Board as a regulator implementing its federal statutory obligation to resolve disagreements . . . about the terms of [a] federally-mandated interconnection agreement." (Docket No. 74, p. 9). Thus, even if Puerto Rico law does circumscribe the Board's authority to *award* liquidated damages, as PRTC urges, such a power is quite different from permitting parties to include a liquidated damages provision in their private contracts. It is improper for this court to attempt to rehash the arguments concerning the winding path of Puerto Rico law on this issue because, first, this court is bound by the First Circuit's interpretation of that set of laws; second, this court reviews the Board's interpretation of Puerto Rico law with deference; and third, the parties have not provided the court with English translations of

the Puerto Rico cases to which they cite.[2]  Nonetheless, it is also unnecessary for the court to provide

its own interpretation of Puerto Rico law because it is clear that the Board provided a reasonable

interpretation of state law, and moreover, that it correctly interpreted federal law in the First Circuit.

PRTC further argues that Puerto Rico law prohibits the Board's imposition of a punitive

damages provision, also known as a "penal clause" under Puerto Rico law, where one of the parties

does not agree to the provision.  (Docket No. 62, p. 18-23).  PRTC suggests that the First Circuit's

WorldNet I decision does not automatically control the outcome here because there the court

"focused on the question that was presented – whether liquidated damages could exceed actual

damages under Puerto Rico law – and . . . did not resolve the instant question."  (Id.).  In WorldNet

I, the First Circuit held that the Board was incorrect in assuming that "liquidated damages exceeding

a reasonable estimate of damages to WorldNet were forbidden either by Puerto Rico law or by

something inherent in the concept of liquidated damages."  WorldNet I, 497 F.3d at 6.  The First

Circuit held, however, that "despite our own holding that neither federal nor Puerto Rico law

automatically forbids such 'penalties'" in the context of arbitrating an interconnection agreement,

"the Board may reasonably conclude [on remand] that such incentive payments are inconsistent with

regulatory policy . . ."  Id., 497 F.3d at 8.  PRTC reads this portion of the WorldNet I decision to

mean that the "First Circuit asked the Board . . . to consider any other statutory provisions,

regulations, or policy determinations precluding the imposition of punitive liquidated damages."

(Docket No. 62, p. 21-22).  I read WorldNet I differently.  In my reading of WorldNet I, the First

Circuit quite clearly held that "neither the Act nor Puerto Rico precedent forbids incentive-based

liquidated damages" and the Board could overturn the arbitrator's imposition of a punitive damages

clause only if "it violates "*general* agency policy".  WorldNet I, 497 F.3d at 8.  In other words, the

First Circuit's decision allowed the Board to reach a different result only if such a result was required

---

[2]  See Puerto Ricans for P.R. Party v. Dalmau, 544 F.3d 58, 67 (1st Cir. 2008) (where a party
relies on a Spanish-language decision of the Puerto Rico courts, "the party must provide the district court
with and put into the record an English translation of the decision").

by the Board's own policies, not by the Board's differing view of the law.

Moreover, PRTC does not contend that Puerto Rico law has changed since WorldNet I was decided.  In fact, the First Circuit cited the principal cases on which PRTC relies in support of its conclusion that "Puerto Rico courts have been more solicitous of liquidated damages clauses than their Anglo-American counterparts, seeming even in private contracts to permit coercive and punitive clauses so long as they are not excessively so."  Id., 497 F.3d at 7 (citing Rochester Capital Leasing Corp. v. Williams Int'l Ltd., 3 P.R. Offic. Trans. 226, 103 D.P.R. 163 (1974); Rodriguez Lopez v. Jimenez Aponte, KLCE-97-000040, 1997 PR App. LEXIS 271, at *10-*13 (P.R. Ct. App., Apr. 29, 1997)).  Finally, PRTC contends that Puerto Rico permits "punitive" liquidated damages clauses "only [in] those instances in which parties willingly, expressly, and a priori agree on the penalty or compensation to be paid."  (Docket No. 62, p. 19).  However, the application of this principle (even if true) is undermined by the reality that "interconnection agreements are not ordinary commercial contracts:  the Act dictates their creation; they are imposed by involuntary arbitration and agency review if the parties cannot agree; and their aim is to secure the public benefit of competition."  WorldNet I, 497 F.3d at 7.  Indeed, it makes little sense to complain that liquidated damages are permissible only where parties "willingly" agree to such a provision in the context of an entire agreement that may be brought into existence against the will  of a party.  Therefore, I find that the Board decided the liquidated damages issue correctly as a matter of law.

I review the spoliation issue under an arbitrary and capricious standard.  The Board addressed PRTC's argument on this issue, noting, "With regard to charges of deliberate destruction of evidence, the Arbitrator makes no mention of intentional shredding, so we conclude that it was not decisional.  Only one sentence in PRTC's brief mentions the shredding of supporting documentation; it is likely that the arbitrator viewed the shredding as an unfortunate error."  (JA, Ex. 92, p. 33). Having reviewed the record material on which PRTC bases its argument, it is clear that the Board's and arbitrator's decisions on this issue were far from arbitrary.  PRTC complains that WorldNet's

expert "selectively destroy[ed] relevant evidence" by shredding the notes containing the underlying data on which WorldNet's damages proposal was based.  (Docket No. 62, p. 24-25).  In fact, the expert, Brian Pitkin, testified that as a general rule he took notes and created drafts directly on his computer and that he created paper documents "only as a temporary convenience for reference," after which he routinely entered those changes into his computer and disposed of the notes.[3]  (JA, Ex. 29, p. 9).  The arbitrator would have been well within her discretion to find that these work practices, and the destruction of a small quantity of the expert's working notes which were later copied into his computer, did not require sanctions for either deterrence or remedial purposes.  See, e.g., Sacramona v. Bridgestone/Firestone, Inc., 106 F.3d 444, 446 (1st Cir. 1997) (district court may exclude spoliated evidence "where necessary to prevent the non-offending side from suffering unfair prejudice. . . . Although deterrence may play a role, the primary aim is remedial, at least absent willful destruction").

Therefore, I find that on the issue of liquidated damages, the Board correctly interpreted the law and its evidentiary determination was not arbitrary or capricious.  Thus, the Board's decision is affirmed.

## 2.    Performance Standards

WorldNet asserts that the Board and the arbitrator erred by adopting general standards (the "Telecordia Standards" or the "Standards") for the performance standards portion of the agreement, rejecting the modifications proposed by the parties and incorporating the arbitrator's own modifications to the standards.  (Docket No. 64-2, p. 22; JA, Ex. 92, p. 37).  The Telecordia Standards were developed by outside consultants to the Board, Telecordia Technologies, Inc.  As of the date of the Board's decision, the Board had initiated a general rulemaking proceeding to determine whether the Telecordia Standards should be adopted for all Puerto Rico

---

[3] Pitkin also testified that he continually made changes within the draft document itself, without maintaining earlier drafts.  PRTC does not challenge this practice, referencing only the "shredding" of paper documents.  (Docket No. 62, p. 25).

telecommunications carriers.  (JA, Ex. 92, p. 37, n.90).  The arbitrator noted that the parties agreed

to apply the Standards to their agreement, with certain modifications:  "In a rare instance of harmony

in this Arbitration, the parties are in agreement as to the adoption of the Telecordia Standards.  Each

offers modifications, however."  (JA, Ex. 85, p. 25).  The arbitrator reasoned that it would be

preferable to await the Board's decision in its pending rulemaking as to any modifications to the

Standards, thus rejecting the parties' proposals and including only those modifications necessary to

make the Standards applicable to a two-party agreement rather than a generalized rule.  (Id., p. 26).

The Board affirmed the arbitrator's policy determination that standardizing performance

measures through generic rules would be more effective than including different standards on an

agreement-by-agreement basis.  In addition, the Board also affirmed the policy rationale that

"standards prepared by an objective party, after a review of comparable standards nationwide, will

best serve to improve service quality in Puerto Rico so that it is on a par with that in the rest of the

United States."  (JA, Ex. 92, p. 39).  I find that on this matter of policy, the Board did not act

arbitrarily and capriciously.

WorldNet also raises legal arguments on this issue, arguing that the Board and arbitrator

erred as a matter of law by failing to resolve this issue by determining, according to the Act's

timetable, whether it complies with the Telecommunications Act.  (Docket No. 64-2, p. 23).  The

cited section of the Act provides that "[t]he State commission shall resolve each issue set forth in

the petition and the response, if any, by imposing appropriate conditions as required to implement

subsection (c) of this section upon the parties to the agreement," within a given time frame.  47

U.S.C. § 252(b)(4)(C).  Subsection (c), in turn, requires a state board to (1) ensure that the arbitrated

agreement satisfies section 251 of the Act, (2) set any rates pursuant to subsection (d); and (3)

provide a schedule for implementation of the terms and conditions of the agreement.  47 U.S.C. §

252(c).

WorldNet contends that the arbitrator violated the Act but failing to  "resolve" the issue, and

by failing to resolve it within the time frame required by law because the performance standards are subject to change pursuant to the ongoing rulemaking.  However, WorldNet does not accurately characterize the Board's decision.  The Act requires that the state board "shall conclude the resolution of any unresolved issues not later than 9 months after the date on which the [LEC] received the request under this section."  See 47 U.S.C. § 252(b)(4)(C).  However, the arbitrator did resolve the issues insofar as there is a term in the contract setting forth the parties' obligations on the matter; that those obligations are subject to change does not make the disputed issue "unresolved" for purposes of the Act.  See, e.g., Petition of DIECA Commc'ns, Inc., No. 00-DCIT-997-ARB, 2000 Kan. PUC LEXIS 110 (Kan. P.U.C. Aug. 18, 2000) (approving rates, terms and conditions for parties to arbitration "to use on an interim basis, subject to modification, and true up if necessary, based on the results of the generic docket"); Application of Cincinnati Bell Tel. Co., No. 96-899-TP-ALT, 1997 Ohio PUC LEXIS 343 (Ohio P.U.C. May 15, 1997) ("[n]either of these requirements [Section 252(b)(4)(C) or Section 251] mandates a permanent decision. . . . By proceeding in this matter, we will certainly be resolving the involved arbitration issues even if we are doing so on an interim basis ").

WorldNet also claims that the Board violated its due process rights.  Although WorldNet included this claim in its complaint, it did not so much as make a passing reference to the "due process" issue in its opening summary judgment brief (Docket No. 64-2); it was only in response to the Board's discussion of this issue (Docket No. 60, p. 39) that WorldNet included the argument in its reply brief.  (Docket No. 74, p. 67).  While ordinarily an argument made for the first time in a reply brief cannot be considered, because WorldNet's reply brief also serves as its opposition to the Board's and PRTC's cross-motions for summary judgment, that rule does not strictly apply in this case.  Nonetheless, the court may easily dispose of WorldNet's due process claim on the merits.

To state a violation of procedural due process, a plaintiff must show (1) a deprivation of a protected property interest, and (2) a denial of due process.  Pérez-Acevedo v. Rivero-Cubano, 520

F.3d 26, 30 (1st Cir. 2008).  Other courts have held that there is no protected property right to particular terms in an interconnection agreement, and specifically, that there is no protected interest in permanent contract terms which would give rise to a due process claim when a state board orders that an interim term be used.  e.spire Commc'ns, Inc. v. N.M. Pub. Regulation Comm'n, 392 F.3d 1204, 1210 (10th Cir. 2004) (affirming denial of due process claim because a "unilateral expectation that the rate stated in the IA [interconnection agreement] was permanent does not constitute a protectable property right").   Moreover, even if WorldNet did have a protected interest in such a contract term, it has been afforded sufficient process.  "The essential requirements of due process . . . are notice and an opportunity to respond."  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985).  WorldNet does not contest that it was given the opportunity to be heard in the proceedings below – which included a hearing before the arbitrator and various motions for reconsideration directed to the Board.

Nonetheless, WorldNet argues that its due process rights were violated because the Board failed in its duty to ensure that the arbitrated agreement satisfies the requirements of section 251 of the Act.  See 47 U.S.C. § 252(c) ("In resolving by arbitration . . . any open issues and imposing conditions upon the parties to the agreement, a State commission shall – (1) ensure that such resolution and conditions meet the requirements of section 251 of this title").  However, WorldNet does not argue now and did not argue before the Board that the arbitrated performance standards in any way *fail* to meet the substantive requirements of section 251; WorldNet argues merely that the Board procedurally acted improperly in imposing interim terms and terms to be decided in a rulemaking of general applicability.  Thus, this argument is without merit.  Moreover, WorldNet conveniently ignores the fact that the Act governs both the arbitration of interconnection agreements as well as the setting of general-applicability rates.  Thus, there is no merit to WorldNet's assertion that it has a "property interest in an interconnection agreement that has been properly and fairly determined to comply with the requirements of the Act and Puerto Rico law." (Docket No. 74, p.

67).  As noted, courts have repeatedly found that interim rates do not violate any such right, <u>e.g.</u>,
<u>Petition of DIECA Commc'ns, Inc.</u>, 2000 Kan. PUC LEXIS 110; <u>Application of Cincinnati Bell Tel.
Co.</u>, 1997 Ohio PUC LEXIS 343; and moreover, the Board's Telecordia Standards are required to
comply with the Act just as much as the arbitrated terms.  <u>See</u> 47 U.S.C.A. § 252(d) ( "just and
reasonable" generic rates must be based on cost, nondiscriminatory, and may include a reasonable
profit).  For the foregoing reasons, WorldNet's performance standards arguments are without merit
and the Board's decision is affirmed.

**3.      Transit Traffic**

        WorldNet asserts that the Board also failed to resolve the issue of transit traffic.  The issue
here involves the question of an incumbent carrier's duty to interconnect with competitors "for the
transmission and routing of telephone exchange service," 47 U.S.C. § 251(c)(2)(A), and whether that
duty extends to the "indirect" transmission and routing of such traffic to third-party carriers, or is
limited to end users.  (Docket No. 64-2, p. 26).  In other words, there is a question as to whether the
incumbent carrier has a duty to provide such indirect interconnection where two competitive carriers
negotiate with the incumbent carrier (with whom they are each interconnected) to "transit" traffic
between their two networks as an alternative to establishing a direct connection between their
respective networks.  (<u>Id.</u>).

        In the administrative proceedings below, the arbitrator noted that the question of the extent
of PRTC's transit traffic duties is currently before the Board in a rulemaking proceeding.  (JA, Ex.
85, p. 59).  The arbitrator thus directed PRTC to continue to carry transit traffic "until the Board
issues its decision in that proceeding."  (<u>Id.</u>).  PRTC challenged this decision before the Board, and
the Board held that the arbitrator "erred in creating an uncertain obligation" and accordingly
modified the arbitrator's decision to include a "sunset provision" of 365-days from the latter of the
effective date of the Board's Reconsideration Order or of any court order finalizing any appeal of
the Reconsideration Order.  (JA, Ex. 92, p. 11-12).  The Board noted that this holding would

"provide ample time for the completion of the Board's rulemaking process." (Id., at p. 12).

Here, WorldNet argues that the arbitrator and Board improperly punted on the issue of transit traffic, and under the Act were required to definitively resolve the issue rather than defer resolution pending the completion of the rulemaking proceeding. (Docket No. 64-2, p. 26). Further, WorldNet argues, PRTC is required by federal law to carry WorldNet's transit traffic, and a decision on the matter does not require awaiting the Board's determination in the rulemaking. (Id.). PRTC does not directly address these arguments, but instead contends that WorldNet is judicially estopped from challenging the Board's decision on this issue. (Docket No. 78, p. 39-42). PRTC argues that in the proceedings below, WorldNet proposed that PRTC be required to carry transit traffic until the Board resolved the legal issues in the rulemaking proceeding, and thus WorldNet cannot now change position to challenge just such a requirement. (Id.). The Board, for its part, argues that its determination on this issue did resolve these issues for purposes of the Act's requirement that it resolve all issues put before it. (Docket No. 60, p. 54-55).

As a preliminary matter, the court must determine what standard of review applies to this issue. The Board did not fully overturn the arbitrator's decision, but instead modified the order to include a "sunset provision". Thus, if the Board has not yet concluded its rulemaking procedure in one year, PRTC will at that time be permitted to cease allowing transit traffic. As noted, the First Circuit has instructed that the Board must accept the arbitrator's decision if it is consistent with the Act, unless the Board finds that the solution conflicts with state statutes, agency rules, or considered policy determinations. WorldNet I, 497 F.3d at 7. While one might quibble over how much the Board's modification substantively changed the arbitrator's decision, it is clear that the Board did not "accept" the arbitrator's decision. As such, the Board could only modify the arbitrator's decision on these enumerated grounds. However, the Board's only explanation for its modification of the arbitrator's decision was that it created "an uncertain obligation." (See JA, Ex. 92, p. 11-12). The Board did not explain whether this uncertainty was a violation of state law, federal law, or

considered Board policy, or whether the Board simply had a difference of opinion with the arbitrator. In the absence of further explanation, the court is unable to determine whether the Board overturned the arbitrator's decision on one of the grounds permitted under WorldNet I.  497 F.3d at 8.

WorldNet argues that the Board's result does not constitute a resolution of this issue, and the arbitrator and Board were required to more definitively resolve the issue.  However, as discussed above, the Board may satisfy its obligation under the Act by putting a term in the parties' contract even if that term is subject to change pending a generic rulemaking.  See Section II.B.2, supra. Because this argument is without merit, I need not reach PRTC's assertion that WorldNet is estopped from making the argument.

However, none of the parties here specifically requested relief in the form of overturning the Board's decision and reinstating the arbitrator's decision,[4] so it is unclear whether the court has the authority to order such a result.  Therefore, the issue is remanded to the Board to reconsider the arbitrator's decision with the options of either (1) accepting the arbitrator's solution, or (2) overturning or modifying the arbitrator's solution only on grounds consistent with this decision.

### 4.    Mixed Bundles

WorldNet challenges the Board's decision to overrule the arbitrator on the matter of pricing the telecommunications services offered in a "mixed bundle" - that is, a packaged resale product containing both telecommunications and non-telecommunications services.  Section 251(c)(4)(A) provides that an incumbent carrier has an obligation "to offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers." 47 U.S.C. § 251(c)(4)(A).  The question here concerns the appropriate "wholesale rates" for products that the incumbent carrier offers at retail to its own customers in mixed bundles.

---

[4] WorldNet sought to have both the arbitrator's and Board's decisions invalidated and a permanent term not subject to the rulemaking determination inserted; PRTC and the Board defended the Board's decision.

To illustrate the issue, the Board gave the example of an ILEC that charges $30 for telecommunications service A, $10 for non-telecommunications service B, and packages them together in mixed bundle C for a resale price of $30.  (JA, Ex. 92, p. 10).  The $30 price-tag of product C reflects a 25% discount over the un-bundled rate of $40 if products A and B were each purchased separately.   The arbitrator determined that (1) the ILEC (PRTC) must disaggregate telecommunications product A from this bundle and offer it individually to the CLEC (WorldNet), (2) at a price reflecting this 25% discount, *e.g.*, $22.50 (25% of $30), and (3) and then apply the parties' agreed-upon wholesale discount (say, 20%) to the $22.50 price.  (Id.)  (See also JA, Ex. 85, p. 135) ("the retail price of a telecommunications service within a mixed bundle is to be determined and used in conjunction with the wholesale discount to determine charges for resold services").

PRTC argued, and the Board agreed, that the appropriate wholesale price under the Act does not reflect this double-discounting, and in this scenario, PRTC need only offer two options to WorldNet: WorldNet may "choose between two rates for the telecommunications service it seeks to resell: the stand alone rate for the telecommunications service and the rate for the mixed bundle which includes one or more telecommunications service", thus reflecting *either* the wholesale discount or the bundled discount  (Id., at p. 11).

Because the Board was overruling the arbitrator on this issue, the Board was required to accept the arbitrator's solution if it was consistent with the statute, "*unless*" the Board "reasonably" found that the arbitrated agreement conflicted with Puerto Rico law, TRB rules, or TRB policy determinations.  WorldNet II, 497 F.3d at 7 (original emphasis).  The Board's decision on this issue rested on multiple grounds: (1) as a legal matter, the arbitrator's decision conflicted with Section 251(c)(4) of the Act; and (2) as a matter of TRB policy, "the Arbitrator should not break new ground, but should apply [established] principles of law . . . ."  (JA, Ex. 92, p. 10-11).

The first question, then, is whether the Board correctly determined that the arbitrated agreement was inconsistent with the Act.  As noted, the Act creates an obligation for ILECs "to offer

for resale at wholesale rates any telecommunications service that the carrier provides at retail to

subscribers who are not telecommunications carriers."  47 U.S.C. § 251(c)(4)(A).  The FCC has

interpreted this provision in the context of mixed bundles to mean that the ILEC must "make

available at wholesale rates retail services that are actually composed of other retail services, i.e.,

bundled service offerings."  <u>Implementation of the Local Competition Provisions in the Telecomms.</u>

<u>Act of 1996</u>, 11 FCC Rcd. 15499, 15936, ¶ 877 (1996) ("First Local Competition Order").[5]  The

FCC was clear, however, that the Act "does not impose on incumbent LECs the obligation to

disaggregate a retail service into more discrete retail services."  <u>Id.</u>  In other words, "The 1996 Act

merely requires that any retail services offered to customers be made available for resale."  <u>Id.</u>  In

2006, a telecommunications company petitioned the FCC for a declaratory ruling establishing that:

> for all promotions greater than 90 days, ILECs are required either to offer to
> telecommunications carriers the value of the giveaway or discount, in addition to
> making available for resale at the wholesale discount the telecommunications
> service that is the subject of the ILEC's retail promotion, or to apply the wholesale
> discount to the effective retail rate of the telecommunications service that is the
> subject of the ILEC's retail promotion; [and]
>
> the effective retail rate of the telecommunications service component(s) of a
> mixed-bundle promotion shall be determined by prorating the telecommunications
> service component based on the percentage that each unbundled component is to
> the total of the bundle if added together at their retail, unbundled component
> prices . . . .

<u>Petition of Image Access, Inc. d/b/a Newphone for Declaratory Ruling</u>, 21 FCC Rcd 7806 (2006).

The FCC requested comments due in July and August 2006, but in the intervening three years, the

FCC has not ruled or acted on the petition (according to the parties' representations and as best as

the court is able to determine).  Thus, while it may be possible that the Act *permits* a pricing

---

[5] The First Local Competition Order was the subject of a series of back-and-forth decisions
between the Supreme Court and the Eighth Circuit, which served as the consolidation forum for all
challenges to the FCC rules.  These cases addressed the FCC's authority to establish pricing
methodology and other requirements under the Act and the merits of that methodology.  <u>See</u> <u>Verizon</u>
<u>Communs., Inc. v. FCC</u>, 535 U.S. 467, 494 (2002) (describing procedural history). While those cases
resulted in vacating certain sections of the First Local Competition Order, the mixed bundles analysis
described above remained intact throughout this process.  <u>See</u> <u>Iowa Utils. Bd. v. FCC</u>, 120 F.3d 753, 819,
n. 39 (8th Cir. 1997) (listing rules and provisions initially vacated).

structure of the sort WorldNet urges, the FCC's analysis in the First Report and Order – along with its silence as to the proposed declaratory ruling – demonstrates that such a structure is not *required* by the current law on this matter.

It not clear, however, that such a pricing provision is "inconsistent" with the Act:  it may not be required by the Act, but it also may not violate the Act.  WorldNet II, 497 F.3d at 7.  Nonetheless, the Board may also overturn the arbitrator if the Board reasonably finds that a decision conflicts with Board policy.  Id.  It seems eminently reasonable for the Board to enforce a policy that "the Arbitrator should not break new ground, but should apply principles of law that have already been established."  (JA, Ex. 92, p. 10-11).  As discussed above, even if WorldNet's proposed pricing structure does not violate the Act, the established principles of law on this matter do not require WorldNet's proposed result.  Indeed, that the arbitrated solution "break[s] new ground" is illustrated by the fact that an identical proposed rule has been pending for three years before the FCC without ruling.  Therefore, the Board's decision on this issue is affirmed.

### 5.        OSS Access Issue I:   Download, Upload, and Batches OSS Access

PRTC challenges the Board's decision requiring PRTC to provide WorldNet with certain forms of Operations Support Systems ("OSS") access.  Generally, OSS includes "databases or facilities used in the provision of a telecommunications service."  11 FCC Rcd 15499, 15763, ¶ 517 (1996).  As the parties characterize it, OSS refers more specifically to computer database systems used to store and provide information related to customer subscription, maintenance and repair, billing, service requests, and other services.  (Docket No. 60, p. 25).  In particular, PRTC challenges the Board's determination that PRTC must provide WorldNet with the ability to download and upload OSS information both as individual datum and in batches of data.   The Board affirmed the arbitrator's decision that PRTC was required to provide this access to WorldNet.  (JA, Ex. 85, p. 63). The Board held that the FCC Local Competition Order required PRTC to provide WorldNet with access in a manner that provides WorldNet with a meaningful opportunity to compete, and

WorldNet Telecomms. v. Telecomms. Regulatory Board of Puerto Rico, et al.                    Page 24
Civil No. 08-1360 (FAB/BJM)
**OPINION AND ORDER**

accordingly, that PRTC was required to provide the OSS functionalities at issue.  (JA, Ex. 92, p. 62).

In the FCC's Third Local Competition Order, the FCC interpreted the Act's requirement of "nondiscriminatory access" to require an ILEC to provide access and unbundled network elements to a CLEC "in substantially the same time and manner to that which the incumbent provides to itself."  Implementation of the Local Competition Provisions of the Telecomms. Act of 1996, 15 FCC Rcd 3696, 3913, ¶ 490 (1999) ("Third Local Competition Order") (internal quotation omitted) (citing 47 U.S.C. § 251(c)(3)).  However, in those cases where such an analysis is inapplicable because the ILEC does not provide itself with access to the particular network element, the FCC requires the ILEC to provide the CLEC with access "in a manner that provides the requesting carrier with a meaningful opportunity to compete."  Id., ¶ 491.

Here, the parties dispute the proper standard and further, the application of that standard to the facts at issue.  WorldNet seeks access to download and upload PRTC's customer information and process that information in batches.  The Board found that PRTC "would have no reason to provide its own employees with the functionalities at issue" and that accordingly, the "meaningful opportunity to compete" standard applies.  (JA, Ex. 92, p. 62).  Applying that standard, the Board found that WorldNet "must have upload, download and batch capability to have a meaningful opportunity to compete."  (Id.).  In other words, the Board required PRTC to provide WorldNet with the ability to obtain individual datum and batches of data.

Where the Board affirms the arbitrator's holding, this court reviews its interpretation of the law *de novo* and its decisions as to matters of fact, policy, and application of general standards under an arbitrary and capricious standard.  Based on the above explication of the FCC's rulings on this issue, I find that the Board correctly determined that a "meaningful opportunity to compete" standard applied to issues of access to elements which PRTC does not provide to its own employees.  See 15 FCC Rcd 3696, 3913, ¶ 491 ("In those situations where an incumbent LEC does not provide access to network elements to itself, we reaffirm our requirement that incumbent LECs must provide access

in a manner that provides a requesting carrier with a meaningful opportunity to compete.").

The next question is whether the Board correctly determined that (1) PRTC does not provide the upload, download, and batch functions to itself and thus the "meaningful opportunity to compete" standard applies to those OSS functions, and (2) that WorldNet required upload, download, and batch functions in order to meaningfully compete. Because these are factual matters, the court reviews the issue under an arbitrary and capricious standard. The Board and arbitrator referred to certain facts concerning these issues, but did not provide citations to particular record evidence. (JA, Ex. 85, p. 63, 220; Ex. 92, p. 62). Nonetheless, I find that there is ample evidence in the record on these issues in support of the Board's decision.

First, the record evidence shows that the functionalities at issue are not the kind PRTC provides to itself. WorldNet seeks more streamlined electronic interfaces in order to access PRTC's databases. (Ex. 28, p. 29). PRTC does not need to provide itself with "electronic interfaces" to access its databases because PRTC's employees have *direct* access to PRTC's own databases. A WorldNet witness explained that when a PRTC customer calls PRTC for a repair, "PRTC keys the repair order directly into its electronic system." (JA, Ex. 28, p. 29). However, "when a WorldNet customer calls WorldNet, WorldNet does not have an electronic interface to do what PRTC can do for its customers." (Id.). Currently, WorldNet's "daily transactions as related to the preorder, order, provisioning and repairs processes" requires duplicative and inefficient data entry processes because information must be entered in multiple systems and cannot be directly uploaded to the PRTC system. (Id., p. 30).

There is also sufficient record evidence that the lack of OSS functionalities hinders WorldNet's ability to compete. WorldNet's inability to download creates an "enormous manual workload in order to try to track [its] orders and repairs and keep any accountability and performance tracking." (JA, Ex. 28, p. 6-7). In the arbitration hearing, a WorldNet witness testified that the absence of download capability has "greatly impacted WorldNet's ability to retain its customer

base", hampered its ability to provide effective service to its own customers, and impacted its business in other ways.  (JA, Ex. 62, p. 182; 233-39).  For example, if a WorldNet customer needs repairs, WorldNet requests that PRTC open a "trouble ticket" in PRTC's system, but WorldNet is unable to directly open "trouble tickets" itself and has limited ability to obtain detailed information on the status of that service request.  (Id., p. 238).

Therefore, the Board applied the correct legal standard and, further, was supported by sufficient record evidence in its application of that legal standard to the facts before it such that its decision on OSS functionalities was not arbitrary or capricious.  Thus, the Board's decision is affirmed.

### 6.      OSS Access Issue II - Access to OSS Systems Access

PRTC challenges the Board's determination, affirming the arbitrator's decision, that PRTC must provide WorldNet with electronic access to certain enumerated OSS interfaces.  The Board determined that WorldNet needed access to the OSS systems and not merely to the information contained in the systems in order for it to, in the terms of the legal standard, have a meaningful opportunity to compete.  (JA, Ex. 92, p. 90).  PRTC challenges this determination on the grounds that (1) as a matter of law, PRTC is not required to provide access to the actual OSS systems so long as it provides access to the OSS functions; and (2) the decision is arbitrary and capricious because it represents an unexplained change in policy by the Board.  (Docket No. 62, p. 34-36).

The FCC explained in the First Local Competition Order that "nondiscriminatory access to the functions of operations support systems . . . would include access to the information they contain."  11 FCC Rcd 15499, 15763, ¶ 517 (1996).  The FCC continued that this nondiscriminatory access is governed by an ILEC's duty under Section 251(c)(3) to provide nondiscriminatory access to unbundled network elements and its duty under Section 251(c)(4) to provide resale services under just, reasonable, and nondiscriminatory terms and conditions.  Id.  This language suggests that the nondiscrimination requirements of the Act extend not only to the "information" contained in OSS,

but also to the "functions" of those systems.  See 11 FCC Rcd at15763, ¶ 517  It is unclear whether

the Board interpreted the "functions" language to extend to providing access to the OSS interfaces

and to the system itself.   However, as a legal matter, it is within the Board's authority to enforce the

nondiscrimination requirements more stringently than that required by law.  <u>WorldNet I</u>, 497 F.3d

at 9 ("[t]he authority of the Board to adopt under local law additional interconnection requirements

not mandated by the Act is explicitly set forth . . . the Act sets a federally mandated floor of equal

service and State commissions retain authority to raise the bar") (internal quotation omitted).

Therefore, even if the Board's result was not *compelled by* law, PRTC provides no evidence that it

was *contrary to* established law.  The question then becomes whether the Board's decision to "raise

the bar" was arbitrary and capricious.

There is ample evidence in the record supporting the Board's determination that PRTC must

provide WorldNet with access to its OSS systems in order to provide WorldNet a "meaningful

opportunity to compete."   The Board noted that its decision was based in part on "the well

documented difficulties the parties have had in implementing OSS requirements in their

interconnection agreements" making it therefore "appropriate that the agreement enumerate the

specific requirements." (JA, Ex. 92, p. 90).  Thus, PRTC's assertion that this decision represents an

arbitrary change in Board policy is without merit.  To the contrary, the reason for the Board's change

in position is explained by its effort to address the parties' past "well documented difficulties." This

documentation includes testimony that the parties have had difficulties implementing WorldNet's

access to OSS functions, resulting in prolonged competitive barriers to WorldNet.  (See, e.g., JA,

Ex. 26, p. 5).  PRTC has not shown any record evidence to the contrary.  Thus, I find that the Board

was not arbitrary and capricious in requiring that PRTC provide WorldNet with access to certain

OSS functions, and the Board's decision is affirmed.

**7.       Collocation Issues**

Collocation refers to an incumbent carrier's obligation under the statute to permit competitive

carriers to install equipment on the incumbent's property in order to connect to the incumbent's existing network.  MCI Telecomms. Corp. v. U.S. West Commc'ns, 204 F.3d 1262, 1269 (9th Cir. 2000).  The Act imposes on incumbent carriers the duty to provide for physical collocation, or where impractical, virtual collocation, "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory . . . ."  47 U.S.C.A. § 251(c)(6).  WorldNet challenges three of the Board's decisions related to collocation, which will each be addressed in turn.

### a.      Collocation Construction

WorldNet and PRTC dispute which of them should have the obligation to perform collocation construction.  The arbitrator noted that while the parties' previous agreement required PRTC to perform collocation construction at WorldNet's request, she was unable to find any legal basis for requiring this arrangement, and further, the arrangement had resulted in problems for the parties.  (JA, Ex. 85, p. 151).  Thus, she adopted PRTC's proposal requiring WorldNet to perform collocation construction.  (Id.)  The Board affirmed the arbitrator's decision, finding that the decision was "well-reasoned" and also correct as a matter of law that there was no legal basis for requiring PRTC to perform construction services.  (JA, Ex. 92, p. 129).  This court reviews the fact-based policy portion of the decision under an arbitrary and capricious standard, but reviews the legal analysis de novo.

As noted, the Act creates a duty for incumbent carriers to "*provide . . . for* physical collocation of equipment necessary for interconnection or access to unbundled network elements at the premises of the local exchange carrier, except that the carrier may *provide for* virtual collocation if the local exchange carrier demonstrates to the State commission that physical collocation is not practical for technical reasons or because of space limitations."  47 U.S.C.A. § 251(c)(6) (emphasis added).  The parties dispute whether the statutory language of "provide . . . for" collocation literally means that the construction must be provided by the ILEC, or simply that the ILEC must permit and make arrangements for the CLEC to construct the collocation on its property.  WorldNet cites a

number of rules and regulations referencing ILEC construction of physical collocation.  (See Docket No. 64-2, p. 31-33).  Most persuasive is WorldNet's citation to an FCC ruling on various matters related to collocation.  Deployment of Wireline Services Offering Advanced Telecomms. Capability, 15 FCC Rcd 17806 (2000) (hereinafter, "Deployment of Wireline Services" or the "Order").

In Deployment of Wireline Services, the FCC established minimum national standards for various collocation services in order to effectively implement the collocation requirements of Section 251(c)(6) of the Act.  15 FCC Rcd at 17812, 17819, ¶ 8, 22.  A careful reading of the Order makes clear how the Act's collocation framework should be interpreted.  First, the Order clarifies the difference between physical and virtual collocation.  Id., ¶ 9.  Physical collocation, which the Act requires an ILEC to provide if "practical" 47 U.S.C.A. § 251(c)(6), is an arrangement in which the competitive carrier has physical access to the collocation space to install, maintain, and repair its equipment. 15 FCC Rcd at 17812, ¶ 9.  In a virtual collocation, the competitive carrier does not have physical access to the space, and instead, the equipment is under the physical control of the ILEC, who is responsible for installing, maintaining, and repairing the equipment.  Id.  The Order sets forth standards for the timely provision of physical collocation specifically, declining to set forth standards for virtual collocation.  Id. at 17819, 17824, ¶ 22, 32.  In establishing national standards for the time frame within which physical collocation must be provided, the FCC noted that an ILEC "must perform essentially three groups of tasks in order to provision collocation space in response to a competitive LEC's request."  Id. at 17820, ¶ 24.  These three steps clarify the ILEC's responsibilities under the statute.  First, the ILEC must inform a CLEC whether its request has been accepted or denied.  Id.  Second, in some instances the ILEC will have to perform design or planning work to accommodate the request, and may have to determine the price it will charge for the collocation arrangement.  Id. at 17820-21, ¶ 25.  Third, the ILEC "must promptly provision the collocation arrangement in those instances where the [CLEC] wishes to proceed with collocation." Id. at 17821, ¶ 26.  The Order sets a deadline for the ILEC to "complete any technically feasible physical

collocation arrangement, whether caged or cageless . . . ."  Id., ¶ 27.  An ILEC is deemed to have

complied with the deadline if it has "complete[d] provisioning of a collocation arrangement," or in

other words, has "finish[ed] construction in accordance with the requesting carrier's application and

turn[ed] functional space over to the requesting carrier."  Id. at 17823, ¶ 30.

    Thus, while a reading of the statute alone might leave room for doubt as to the precise

meaning of the requirement that an ILEC "provide . . . for physical collocation," the FCC's

elaboration of the various steps involved in providing for collocation clarifies that the requirement

makes the incumbent carrier responsible for "construction" of the collocation arrangement.  Id. at

17823, ¶ 30.  Indeed, even in the case of physical collocation in which the CLEC ultimately has

physical access to the collocation space to install, maintain, and repair its equipment, the FCC

requires the ILEC to "finish construction in accordance with the requesting carrier's application"

before "turn[ing] functional space over to the requesting [CLEC]."  Id. at 17812, 17823, ¶ 9, 30.

Once the space is turned over to the CLEC in a physical collocation arrangement, responsibility then

passes to the ILEC to "install, maintain, and repair its equipment".[6]  Id. at 17812, ¶ 9.  Thus, the

Order describes a scenario in which the incumbent carrier is responsible for constructing the

collocation space or arrangement - the part of the job that involves the incumbent's equipment and

space - and the competitive carrier is then responsible for installing its own equipment once the

collocation space has been turned over to it.

    PRTC's response to Deployment of Wireline Services does not alter this analysis.  PRTC

asserts that the Order "makes clear that . . . it is up to the various states to implement their own

collocation standards." (Docket No. 78, p. 55).  This assertion fails to help PRTC's cause.  First, the

Order sets a national standard for the *deadlines* by which an ILEC must "provide . . . for  physical

collocation" under the Act.  The FCC explains that states may provide for different time frames for

---

[6] This arrangement stands in contrast to the virtual collocation arrangement in which "the
incumbent is responsible for installing, maintaining, and repairing equipment designated by the
competing provider."  Id.

physical collocation provisioning.  15 FCC Rcd at 17823, ¶ 29.  However, the FCC's authorization

for states to set their own *deadlines* for providing for collocation does alter the import of the FCC's

interpretation of the steps involved in providing for collocation.  Moreover, the FCC allows that a

state "could set its own standards by statute, through an existing or future rulemaking order, by

enforcing a state tariff, or by applying the precedent of a state arbitration decision." Id., ¶ 22.  PRTC

suggests that the Board has in fact taken one of these steps here, and thus the state has "set its own

standards" as permitted by the Order.  This assertion is not persuasive.  First, as noted, the Order

allows a state to set different deadlines, not to wholly change the interpretation of "provide . . . for

collocation."  Second, even if "applying the precedent of a state arbitration decision" would allow

for the result here, the Board gives no indication that it is attempting to set a standard that differs

from the national standard.  Indeed, the Board appears unaware of this FCC interpretation of the Act,

finding that "there is no legal basis for the Arbitrator to require PRTC to perform construction

services."  (JA, Ex. 92, p. 129).  Granted, it is unclear that either of the parties brought this Order

to the Board's attention in the proceedings below.  Nonetheless, on this *de novo* review, I find that

the FCC has established that the Act indeed requires an ILEC to perform construction of the

collocation arrangement in response to a request for collocation, and therefore the Board's

determination was incorrect as a matter of law.

    Nevertheless, the Board also affirmed the arbitrator on the alternate grounds that the record

demonstrated "problems as a result" of the previous agreement's requirement that PRTC perform

collocation construction.  (JA, Ex. 85, p. 151).  In particular, the arbitrator cited testimony describing

the disputes that would arise between PRTC and WorldNet if PRTC were required to perform

collocation construction work at WorldNet's request.  (JA, Ex. 19, 7-10).  However, the foregoing

analysis demonstrates that the law requires PRTC to perform construction of the collocation

arrangement, and thus the Board does not have the authority to make such an exception to the FCC's

interpretation of the Act's requirements.

Therefore, because the Board applied the incorrect legal standard, the court vacates the Board's decision and remands this issue for further proceedings consistent with this opinion.  In particular, on remand the Board should craft a solution under which PRTC is required to construct the portion of the collocation space or arrangement which involves PRTC's space and equipment, and once that space has been turned over to WorldNet, WorldNet becomes responsible for installing its own equipment.

**b.       Collocation Pricing**

WorldNet objects to the Board's determination on the issue of collocation price quotation response.  The Board adopted PRTC's proposal that when PRTC quotes a price for collocation, WorldNet's challenge to that price will toll PRTC's time for provisioning the collocation arrangement such that, in effect, PRTC will not have to provision the collocation until the parties have agreed on the price.  WorldNet argues that this arrangement will result in "irreparable harm" to it as  PRTC uses the pricing dispute to delay construction and with it, WorldNet's ability to effectively compete.  The essence of WorldNet's argument is that the contract provision is bad policy because "PRTC can still be made whole through interest and true-ups if the charges are ultimately deemed proper [but] WorldNet suffers irreparable harm if its collocations were delayed by the requirement . . ."  (Docket No. 64-2, p. 35).  WorldNet also asserts that the provision violates the Act's requirement that collocation be provided on terms that are "just, reasonable, and nondiscriminatory."  47 U.S.C. § 252(c)(6).  PRTC, in turn, argues that the Board's decision was not arbitrary and capricious because there was no evidence in the record to support WorldNet's claim of irreparable harm, and did not violate the Act because the requirement is just and reasonable. (Docket No. 78, p. 57).

While the parties dispute the meaning of the broad language of the Act, WorldNet does not point to any rules or regulations further construing that language in the context of collocation pricing

disputes.[7]   In light of the lack of FCC or other relevant guidance before the court, the task of interpreting "just" and "reasonable" becomes a matter of policy, not law.  Put differently, WorldNet has not articulated how the arbitrator's decision violates the Act, merely that it improperly interprets the "just" and "reasonable" requirements.  Accordingly, WorldNet's invocation of the Act does not trigger this court's *de novo* review.  Instead, WorldNet's arguments are more properly viewed as policy and factual arguments, and thus require this court to determine whether the Board's decision was arbitrary and capricious.

The arbitrator here found that it was "*not* unreasonable to be required to agree on pricing before construction commences." (JA, Ex. 85, p. 180).  This decision was based on record evidence that disputes had already arisen between WorldNet and PRTC as a result of the provision in the prior agreement allowing WorldNet to dispute pricing quotations after construction was undertaken.  (Id., citing JA, Ex. 19, p. 20).  In the cited testimony, a witness for PRTC stated that, "there already have been instances in the recent collocation work done for WorldNet in which WorldNet disputed the price quotation after work had been started and/or almost completed" and "WorldNet certainly would not be able to tell one of its own contractors that it disagrees with a contractor's price after the contractor's work is done; there is no reason why WorldNet should get that opportunity when PRTC is involved."  (JA, Ex. 19, p. 20).

The Board affirmed the arbitrator's decision, finding it "well-reasoned and supported by sufficient evidence," and further, "entirely reasonable." (JA, Ex. 92, p. 131).  The Board elaborated that it was reasonable to require the parties to agree on pricing before construction begins because if "WorldNet cannot reach agreement with PRTC before construction begins, WorldNet is free to consult with other contractors who can perform the requested services."  (Id.).

---

[7] Deployment of Wireline Services makes oblique reference to the collocation price quotation process, but makes no explicit reference to the impact of pricing disputes on the timeline it sets forth.  15 FCC Rcd at 17821, ¶ 25 (an ILEC "can streamline its design, planning, and price quotation processes by developing standardized rates, terms, and conditions . . .").  In any event, WorldNet does not cite or analyze this Order or any other rules or regulations on this issue.

A review of these decisions shows that there is record evidence supporting the arbitrator's stated concern that disputes may arise between the parties if WorldNet is permitted to dispute a price after construction has already begun.  However, it is unclear that there is any evidence supporting the Board's assertion that if "WorldNet cannot reach agreement with PRTC before construction begins, WorldNet is free to consult with other contractors who can perform the requested services." (Id.).  The portion of the collocation at issue here appears to be that for which PRTC is responsible: establishing the connection to PRTC's own equipment and setting aside space for competitive carriers.  (See Section II.B.7.a, supra).  The idea that WorldNet could hire its own contractors stands in contrast to the scenario elucidated in Deployment of Wireline Services, in which incumbent carriers bear responsibility for "finishing construction in accordance with the requesting carrier's application and turning functional space over to the requesting carrier." 15 FCC Rcd at 17823, ¶ 30. Under this scenario, PRTC is responsible for the initial collocation arrangement construction, and WorldNet would not have authority to access that space, or hire contractors to work in that space, until PRTC has turned over the space to WorldNet.  The parties do not point to any record evidence suggesting that the result should be any different here.  Importantly, this is the only remedy the Board suggests WorldNet may have if it believes that PRTC is – as WorldNet fears – using the price quotation process improperly to "hold WorldNet's network build out hostage to disputes over [] pricing." (JA, Ex. 52, p. 18).  The Board does not suggest any other remedy.[8]  In this way it appears that at least this portion of the Board's decision was not properly based on record evidence consistent with the governing law, and is thus arbitrary and capricious.  Therefore, this issue is remanded to the Board to properly decide in accordance with this opinion and the evidence in the record.

It should be noted that the parties may be conflating various elements of collocation pricing. WorldNet suggests that collocation pricing includes PRTC's rates for collocation and for use of its

---

[8] In contrast, WorldNet suggest that, under its proposal, "PRTC can still be made whole through interest and true-ups if the charges are ultimately deemed proper . . . ."  (Docket No. 64-2, p. 35). However, none of the parties suggest that a true-up remedy along these lines would be available to WorldNet under the Board's solution.

facilities (Docket No. 64-2, p. 36), but the dispute here appears to center on the price of contractor fees for initial construction of the collocation arrangement.  Moreover, within the construction process, it appears that the dispute here concerns only that construction for which PRTC is responsible (See  Section II.B.7.a., supra) and not the installation of equipment for which WorldNet bears responsibility, but none of the administrative decisions or briefs are clear on this point. Viewed against that background, the parties do not seem to dispute that they would be able to agree on PRTC's fees ahead of time.  Instead, the dispute here concerns advance agreement to the pricing estimates of third-party contractors.  The parties appear to assume, but do not explicitly inform the court, that PRTC is responsible for arranging this construction, but WorldNet is responsible for paying the fees.  However, on remand the Board should make explicit exactly which fees are at issue here in order to better facilitate the court's analysis of the issue and should consider the collocation pricing issue in light of the court's analysis in Section II.B.7.a.

### c.        Collocation Construction Schedule

The arbitrator adopted WorldNet's proposal to require a joint collocation schedule and time limits on PRTC's response to any reasonable collocation-related requests made by WorldNet that are not included in the joint schedule.  (JA, Ex. 85, p. 185-86).  The Board agreed with PRTC's objection to holding it responsible for compliance with the schedule where third-party contractors perform construction.  (JA, Ex. 92, p. 89).  However, the Board affirmed that portion of the arbitrator's decision requiring PRTC's compliance with the schedule and with other non-scheduled requests where PRTC performs the construction.  (Id.).  As a result, PRTC will be responsible for liquidated damages under the agreement where it does not comply with the schedule.  (Id.).

WorldNet objects that PRTC should still be responsible for compliance with the schedule even where a third-party contractor is involved.  (Docket No. 64-2, p. 37).  In particular, WorldNet argues that the Board's decision was arbitrary and capricious because it reflected a misunderstanding of the collocation process, and that in reality, PRTC is still "significantly involved" in the

construction process even where work is delegated to a third-party contractor.  (Id.).  PRTC's response is confusing because it seems to focus on a different aspect of the arbitrator's decision than the one challenged by WorldNet.  PRTC focuses on the portion of the Board's decision affirming the arbitrator's requirement that PRTC perform certain non-scheduled tasks within five days of WorldNet's "reasonable" request, arguing that there is "no rational connection" between the punitive liquidated damages provision and this requirement.  (Docket No. 78, p. 60).  PRTC does not appear to be directly challenging this provision, however, but uses it to argue "[a]gainst this backdrop, it was well within the discretion of the Board to limit the operation of the liquidated damage provision associated with these sections."  (Id.).  As best as the court can make sense of the issue, the Board's "limit[ation of] the operation of the liquidated damage provision" was not based on the non-scheduled activities, but rather on those construction tasks performed by third-party contractors rather than PRTC itself.  (JA, Ex. 92, p. 89 ("We direct the Parties to draft language making it clear that only when PRTC performs construction will it be liable for liquidated damages.")).  If there is a relationship between the non-scheduled activities and the activities performed by a third-party contractor, the parties have not so informed the court.

WorldNet challenges the portion of the Board's decision which overruled the arbitrator.  As noted, the First Circuit instructs that when the Board delegates its authority to an arbitrator, it may overturn the arbitrator only if the decision is inconsistent with the Act or if the Board reasonably finds that the arbitrator's solution conflicts with Puerto Rico law, Board rules, or Board policy determinations.  WorldNet I, 497 F.3d at 7.  Here, the Board's rationale for overturning the arbitrator's decision as to third-party contractors was that the decision was "inconsistent" with other portions of the decision.  (JA, Ex. 92, p. 89).  In its brief on this motion, the Board does not elaborate on its rationale for this decision, arguing only that WorldNet's argument is "puzzling" because "PRTC should not be required to pay liquidated damages to WorldNet because a third-party contractor delayed construction of a facility."  (Docket No. 60, p. 57).  The Board seems to believe

that this is such a straightforward, common-sense view that no further explanation is required. However, the arbitrator seems to have viewed the evidence differently.  A difference of opinion as to the record or the evidence is not a proper ground for the Board to overturn the arbitrator. Therefore, the Board exceeded its authority in overturning the arbitrator and the arbitrator's determination on this issue – that PRTC be held responsible for liquidated damages for delays due to third-party contractors – is hereby reinstated.

### 8.    Pricing Issues

The parties challenge various pricing decisions of the Board.  While the general standard applies here in which this court reviews legal determinations *de novo* and fact-based determinations under an arbitrary and capricious standard, courts have cautioned that there is reason for courts to be particularly deferential to agency determinations in the pricing context.  TDS Metrocom, LLC v. Bridge, 387 F. Supp. 2d 935, 939 (W.D. Wis. 2005) ("[b]ecause courts lack the technical expertise to conduct an in-depth analysis of rate components, a deferential standard of review of the commission's choice of rate components is appropriate"); MCIMetro Access Transmission Servs. v. GTE Northwest, No. C97-742WD, 1998 U.S. Dist. LEXIS 11335 (W.D. Wash. July 7, 1998) ("[s]ubstantial deference should be afforded to a state commission's findings because the Act gives it original jurisdiction in the area of rate-setting").  See also Southwestern Bell Tel. Co. v. FCC, 168 F.3d 1344, 1352 (D.C. Cir. 1999) (regarding FCC ratemaking, "because agency ratemaking is far from an exact science and involves policy determinations in which the agency is acknowledged to have expertise, courts are particularly deferential when reviewing ratemaking orders") (internal citation omitted).

However, where the Board overturns the arbitrated decision, a different analysis applies.  The Board may reject an arbitrated agreement only if it finds that the agreement does not hold the carriers to their obligations under section 251, or, more relevant here, fails to meet the pricing standards of section 252.  47 U.S.C. §§ 252(e)(2)-(3); WorldNet I, 497 F.3d at 5-6.  As noted, in implementing the statute, the FCC sought to address tensions between the interests of incumbent and competitive

carriers by directing carriers and state boards to set UNE rates using a forward-looking methodology known as TELRIC.[9]  47 C.F.R. §§ 51.505-515.  Under TELRIC, prices are based on the long-run costs that would be incurred to produce services using the most-efficient technology presently available regardless of whether the ILEC actually uses the most up-to-date technology.  AT&T Commc'ns of Ill., 349 F.3d at 404-05.

a.        **WorldNet's Pricing Challenges**

(1)        **NID and Block Terminal Costs**

The first pricing dispute concerns the costs associated with network interface devices and block terminals.  A network interface device (NID) is a small boxed device connecting the telephone network to the inside wires of a house or other premises.  (Docket No. 78, p. 11).  A block terminal is similar, but connects the telephone network plant to the inside wires of a large building.  (Id.).  The issue here concerns, in particular, "ground rods," or metal shafts driven into the ground that carry current away from the telephone network in case of an electrical surge.  (Id).  Ground rods are typically connected to NIDs and block terminals, and thus factored into the costs of those two network elements.  (Id.).  The dispute here concerns whether the appropriate costs of these elements should reflect PRTC's installation of ground rods to be used with all of its NIDs and block terminals, or whether it should use existing ground rods in cases where they have already been installed in a given location by electric power companies or cable television providers.  (Id., p. 12).

Before the arbitrator, PRTC presented evidence that its practice was to install ground rods together with all of its NIDs and block terminals rather than "rely on non-company equipment that may be moved, changed, replaced, etc."  (JA, Ex. 85, p. 293).  WorldNet provided evidence that ground rods needed to be installed just 66% of the time for NIDs and 10% of the time for block terminals.  (Id.).  Based on this evidence, the arbitrator determined that in a "least cost, most efficient designed network", PRTC should share the existing ground rod and its insistence that it should

---

[9] The Supreme Court has upheld the FCC's selection of TELRIC methodology for pricing network elements under the Act.  Verizon Commc'ns, Inc. v. FCC, 535 U.S. 467, 523 (2002).

install new ground rods in all cases was "unreasonable." (Id.).  The arbitrator accordingly adopted WorldNet's proposal.  (Id.).

The Board overturned the arbitrator's decision.  Although the Board argues here that its decision was based on the proper application of TELRIC principles, the Board decision below contained no articulated consideration of those principles.  Instead, the Board held that "the record does not provide sufficient support for WorldNet's proposals" and concluded that the arbitrator erred in adopting those proposals "without sufficient evidence." (JA, Ex. 92, p. 23).  According to the Board, PRTC's practice was based on safety concerns.  (Id.).  In what can only be characterized as a reconsideration of the evidence, the Board found that "without contradictory persuasive evidence, PRTC's safety concerns must prevail." (Id.).

The First Circuit has made clear that the Board should treat an arbitrated agreement as a "*presumptive* solution" which it "must" accept if it is consistent with the statute, "*unless*" the Board "reasonably" finds that the arbitrated agreement conflicts with Puerto Rico law, Board rules, or Board policy determinations.  WorldNet I, 497 F.3d at 7.  Here, the Board did not even suggest that the arbitrated solution conflicted with the statute, Puerto Rico law, Board rules, or Board policy determinations, but rather stated that the arbitrator incorrectly weighed the *evidence*.  The Board exceeded its authority in overturning the arbitrator on this ground.

This result is not altered by the Board's assertion before this court that its decision was based on proper application of TELRIC principles, and thus reflected a finding that the arbitrated decision was inconsistent with federal law.  The Board asserts here that the arbitrator improperly ignored PRTC's supposed safety concerns because "TELRIC does not require that the Board ignore these safety factors in positing an efficient hypothetical network." (Docket No. 60, p. 52).  However, even if the Board is correct in asserting that TELRIC *permits* a consideration of safety factors, such a fact does not mean that the arbitrator was incorrect – as a matter of law or otherwise – in failing to give the same weight to the safety factors.  Moreover, the Board does not suggest that the arbitrator failed to consider the safety factors, but rather it appears that the arbitrator and the Board simply weighed

the evidence differently.  This is precisely the sort of situation in which the First Circuit instructs that the Board may not properly overturn the arbitrator: when a state board delegates its duties to an arbitrator, it cannot overturn the arbitrator's solution simply because "if framing the agreement itself" it would follow different policies based on "ad hoc preferences".  WorldNet I, 497 F.3d at 8.

Therefore, the Board exceeded its authority in overturning the arbitrator on the NID and block terminal issue, and summary judgment is granted for WorldNet, reinstating the arbitrator's decision on the issue.

### (2)    Circuit Demand

WorldNet's second pricing challenge concerns pricing for unbundled "transport" network elements, which are connections between PRTC switching centers that WorldNet leases for its use. (Docket No. 78, p. 14).  For the purposes of establishing the proper TELRIC-compliant rate for those network elements, the Board considers both the level of investment in the various pieces of equipment needed to establish transport circuits as well as a projection of total demand for such transport circuits.  (Id.; JA, Ex. 85, p. 299).  The Board considered proposals from both parties in order to determine the proper rate.  PRTC had proposed a cost model based on 2005 and 2007 prices for the equipment for the investment part of the model, and divided it by the 2001 circuit demand figure in order to establish the forward-looking rate.  (Docket No. 78, p. 14).  WorldNet disputed the use of the 2001 circuit demand level and offered testimony of its own expert witness to establish a more current, forward looking demand figure.  (JA, Ex. 85, p. 299).  The arbitrator determined that the future demand projection provided by WorldNet's expert – which was unrefuted by PRTC – was "reasonable" and thus applied that figure to the cost model.  (Id.).  The Board, however, found that the arbitrator had failed to "account for the match between investment and demand" and therefore, the arbitrator's order was "inconsistent with Section 252(d) in not considering all of the data and the effect of the decision in determining forward-looking rates."  (JA, Ex. 92, p. 25).  Accordingly, the Board overturned the arbitrator's price model and applied PRTC's model with its 2001 circuit demand figure.  (Id.).

WorldNet contests the Board's determination, arguing the Board exceeded its authority in overturning the arbitrator on these grounds. (Docket No. 64-2, p. 12). As noted, the Board should consider an arbitrated agreement to be a "*presumptive* solution" which it "must" accept if it is consistent with the statute, "*unless*" the Board "reasonably" finds that the arbitrated agreement conflicts with Puerto Rico law, Board rules, or Board policy determinations. WorldNet I, 497 F.3d at 7.

Here, the Board's invocation of the magic words "inconsistent with Section 252(d)" is not sufficient to give the it *carte blanche* to overturn the arbitrator. A closer reading of the Board's decision makes clear that the Board's dispute with the arbitrator was actually based on a difference in interpretation and weight given to the record evidence. (JA, Ex. 92, p,. 25). The Board did not provide any discussion of *how* the arbitrator's decision conflicted with the TELRIC standard or was otherwise inconsistent with the Act, nor did the Board flesh out that finding in its briefs before this court (to the extent that a such a *post hoc* justification would be credited here). The Board's sole argument here concerning the TELRIC standard is that "TELRIC requires the Board to consider all of the costs of a hypothetical future model" and thus must consider both the number of circuits and the investment costs. (Docket No. 60, p. 53). However, there is simply no indication that the arbitrator did not consider "all of the costs". To the contrary, the arbitrator cited the rule that "TELRIC-based pricing requires a forward looking examination of investment and a projection of future demand." (JA, Ex. 85, p. 299). Referencing the need to factor both investment and future demand into the model, she noted that PRTC's proposed model based both these figures on 2001 levels and stated her skepticism with PRTC's assertion that it was unable to project circuit demand for a forward-looking model. (Id.). Thus, it appeared that the arbitrator did consider all of the data and the TELRIC requirements. In such circumstances, the Board may not overturn the arbitrator simply because it would have reached a different conclusion about the evidence "if framing the agreement itself." WorldNet I, 497 F.3d at 8. Therefore, summary judgment is granted for WorldNet, reinstating the arbitrator's decision on the issue.

### (3)     Value of Land

WorldNet's third pricing challenge concerns a dispute over the value of land on which PRTC might build physical plants in the future in order to determine a rate for the square meters of land purchases. Before the arbitrator, PRTC proposed a figure of $400 per square meter, despite evidence that its recent land transactions averaged $328 per square meter, asserting that its future collocation sites would be located in the San Juan metro area and thus have a higher cost. (JA, Ex. 85, p. 306). The arbitrator stated that there was no evidence supporting PRTC's assertion that future collocation sites would be located in "the 'metro area'" and, in the absence of evidence showing land estimates from "all possible locations" of future collocation sites, she relied on the $328 figure as the basis for the arbitrated price. (Id.). The Board concluded that the arbitrator "misunderstood the evidence" and therefore "erred through inconsistency with Section 252(d)." (JA, Ex. 92, p. 27). Accordingly, the Board overturned the arbitrator's decision and adopted PRTC's proposal of $400 per square meter. (Id.).

Again, the Board's invocation of a supposed inconsistency with the Act is not a magic talisman shielding its decision from this court's scrutiny. The Board did not provide any explanation in either its decision or its filings before this court as to *how* the arbitrator's decision is inconsistent with Section 252(d). Moreover, the Board's assertion that the arbitrator "misunderstood the evidence" makes clear that its dispute with the arbitrator concerns their differing interpretations of the evidence. "[W]hen the Board delegates power to an independent arbitrator, . . . it is limited" in its authority to review the resulting agreement, and a differing view of the evidence is not a proper ground on which to overturn the arbitrator. See WorldNet II, 497 F.3d at 14. The Board asserts here that the arbitrator erred because "the record evidence showed that, to date, WorldNet had *only* requested collocation in metro areas, and had never indicated that it was considering ordering sites outside of the metro areas. Thus, because the evidence showed that the metro area would be the only location for the collocation sites, . . . the Arbitrator's approved rate did not satisfy TELRIC." (Docket No. 60, p. 54). This argument is flawed in multiple respects. First, the arbitrator explicitly

stated that "there is no evidence that the 'metro area' will be the only location for collocation sites" (JA, Ex. 85, p. 306), and thus it simply appears that the Board credited evidence which the arbitrator did not.  As noted, a differing view of the record is not proper grounds for reversal.  Second, the Board's statement fails as a matter of its own internal logic.  TELRIC standards require a forward-looking cost model, and thus the relevant inquiry – as the arbitrator noted – is where future collocation sites will be located.  Even if there was evidence, as the Board asserts (without citation to any evidence), that WorldNet had "to date, . . . only requested collocation in metro areas," this fact would not mandate a finding that "the metro area would be the only location for the collocation sites" in the future.  (See Docket No. 60, p. 54).  Therefore, the Board exceeded its authority in overturning the arbitrator, and summary judgment is granted for WorldNet, reinstating the arbitrator's decision on the issue.

### b.      PRTC's Pricing Challenges

### (1)      Transit Traffic Rates

Both WorldNet and PRTC challenge the rate adopted by the Board for when PRTC transits WorldNet's traffic.  Transit traffic refers to an arrangement whereby, in a typical situation, two competitive carriers do not have sufficient traffic between them to justify dedicated facilities connecting their respective networks, so instead they negotiate with the incumbent carrier (with which they are each interconnected) to "transit" traffic between their two networks as an alternative to a direct connection.  (Docket No. 62, p. 65).

The arbitrator did not decide this issue.  (JA, Ex. 105, p. 17).  The Board determined (1) as a legal matter, it is unsettled whether TELRIC principles apply to transit traffic rates; (2) the applicability of TELRIC rates should be determined in the Board's ongoing proceeding as a matter of general policy; and (3) for "pragmatic" reasons, it is fair and reasonable to adopt a rate of $0.0038 per minute, the lower of various rates proposed by PRTC over the course of the proceeding and the current rate in effect, though higher than WorldNet's proposals.  (Id., p. 18).  PRTC argues that the Board's decision was arbitrary and capricious because the Board had initially found that there was

"insufficient information" to support the adoption of any of the proposed rates, then reversed itself and adopted a rate for which there was not (unlike PRTC's other proposal) cost support or other record evidence. (Docket No. 62, p. 67). WorldNet argues that the Board's adopted rate should be vacated because it is not TELRIC-compliant. (Docket No. 64-2, p. 28).

The FCC has held that TELRIC pricing is not required for transit service rates. <u>Petition of WorldCom, Inc., Pursuant to Section 252(e)(5) of the Commc'ns Act for Preemption of the Jurisdiction of the Virginia State Corp.Comm'n Re. Interconnection Disputes with Verizon Virginia Inc.</u>, 17 FCC Rcd 27039, 27101 ¶ 117 (2002) (hereinafter "<u>Petition of WorldCom I</u>") ("any duty Verizon may have under section 251(a)(1) of the Act to provide transit service would not require that service to be priced at TELRIC"). The parties have not indicated that either the FCC or any other authority has subsequently altered this determination and the court defers to the FCC's interpretation of the Act under the doctrine of <u>Chevron</u> deference. <u>See</u> <u>Chevron, U.S.A., Inc.</u>, 467 U.S. at 842-44. Therefore, as a legal matter, the Board was correct in holding that it was not required to apply TELRIC rates.

As for PRTC's argument that the Board's decision was arbitrary and capricious, PRTC takes a curious position here. The Board here adopted PRTC's own proposal – albeit, PRTC's initial proposal before PRTC nearly doubled its proposed rate: in the arbitration proceeding, PRTC proposed a rate a $0.0038 per minute of use of transit traffic, and in the further proceeding before the Board, proposed a rate of $0.00739, a 94% increase over its earlier proposal. In rejecting the $0.00739 rate, the Board noted that (1) it was nearly double the rate PRTC had originally proposed; and (2) it was 14% higher than the rate included in PRTC's tariff filing with the FCC. (JA, Ex. 105, p. 18). On the other hand, the rates proposed by WorldNet in the arbitration proceeding and the further hearings were, respectively, 82% and 37% lower than PRTC's lowest proposed rate. (<u>Id.</u>). Accordingly, the Board determined that it would be "fair and reasonable" to use a rate proposed by PRTC, but to use the lowest of the rates it had proposed at different stages of the proceeding. (<u>Id.</u>).

However, PRTC complains that the Board's decision was arbitrary and capricious because

there was not cost support or other record evidence for the rate the Board ultimately selected. (Docket No. 62, p. 67). WorldNet counters that (1) the backing of a cost-study would not automatically make PRTC's later (and higher) proposal reliable and reasonable, (2) PRTC's cost study was based on embedded PRTC costs, which the FCC has found do not serve as an effective basis to foster competition, and (3) the Board acted reasonably in rejecting PRTC's proposal that was higher than its earlier proposal and its rate on file with the FCC. (Docket No. 74, p. 62).

These complex factual arguments illustrate the concerns other courts have expressed about the ability of courts to effectively review pricing determinations by administrative agencies. See, e.g, TDS Metrocom, LLC, 387 F. Supp. 2d at 939 ("[b]ecause courts lack the technical expertise to conduct an in-depth analysis of rate components, a deferential standard of review of the commission's choice of rate components is appropriate"). The decision involved a number of technical factors, and in the absence of demonstrating a legal violation or a clearly unreasonable result, this court defers to the Board's determination on the myriad technical and policy factors that go into its pricing determinations. Applying the appropriate deference to that determination, I find that the Board acted within its authority in adopting the transit service rate here and its determination is affirmed.

### (2)     Depreciation Inputs

"Depreciation" is the mechanism by which the investment in an asset is recovered over the life of the asset. Petition of WorldCom, Inc., Pursuant to Section 252(e)(5) of the Commc'ns Act for Preemption of the Jurisdiction of the Virginia State Corp. Comm'n Re. Interconnection Disputes with Verizon Virginia Inc., 18 FCC Rcd 17722, ¶ 105 (2003) ("Verizon Virginia").[10]    The

---

[10] In Verizon Virginia and Petition of WorldCom I, 17 FCC Rcd 27039, the FCC Wireline Competition Bureau ("WCB") arbitrated the terms and conditions of the interconnection agreements between Verizon Virginia and various competitive carriers. The Virginia state board declined to arbitrate the terms and conditions of the agreements under federal standards, as required by section 252(c) of the Act, asserting that it could not do so without potentially waiving its Eleventh Amendment sovereign immunity. Thus, upon petition, the FCC assumed jurisdiction pursuant to section 252(e)(5) of the Act, and delegated to the WCB the duty of resolving the requests for arbitration. Petition of WorldCom I, 17 FCC Rcd at 27044-45, ¶ 6. The WCB "advises and makes recommendations to the [FCC], or acts for the

depreciation calculation takes two factors into consideration: the useful life of the asset and the rate at which the asset is depreciated over the useful life.  Id., ¶ 106.  The dispute here concerns the figures used for the range of asset lives.  The arbitrator applied a rate based on the determination of the FCC in Verizon Virginia.  (JA, Ex. 85, p. 285).  In Verizon Virginia, the FCC found that asset lives at the low end of a "safe harbor" range (as established by the FCC in 1994 and 1995 and modified in 1999) were consistent with the FCC's TELRIC rules.  Verizon Virginia, 18 FCC Rcd at 17770, ¶ 112.  The arbitrator here thus followed the FCC's guidance in that order and required the parties to use asset life lengths falling within the FCC safe harbor range since those lengths have been determined by the FCC to be TELRIC-compliant.  (JA, Ex. 85, p. 285).  The Board affirmed the arbitrator as legally correct and correct in light of her review of the record.  (JA, Ex. 92, p. 17).

PRTC contends that the Board and arbitrator erred in this holding because the safe harbor figures were adopted "to allow carriers to avoid the expense of performing a thorough depreciation study." (Docket No. 62, p. 42).  Under this framework, "[i]f a carrier used regulatory lives that fell within the [safe harbor] ranges, it was not required to file a comprehensive study; if it used regulatory lives that fell outside the ranges, it was required to file a full depreciation analysis." (Id.).  This analysis appears to be correct.  See Matter of Simplification of the Depreciation Prescription Process, 10 FCC Rcd 8442, 8443-8444, ¶ 3 (1995) ("Under our new process, if a price cap LEC meeting the requisite criteria selects future net salvage and projection life estimates that are within the established ranges, it need not submit the detailed supporting data otherwise required. . . .These streamlined procedures are intended to simplify the depreciation process . . .").  PRTC argues that here, it submitted just such a detailed depreciation study, and therefore it was permitted to rely on that study in lieu of reliance on the safe harbor ranges.  (Docket No. 62, p. 43).  Initially, it appears that the Board's quibble with PRTC was not over the legal standard but over the weight to give the

---

[FCC] under delegated authority, in all matters pertaining to the regulation and licensing of communications common carriers and ancillary operations." 47 CFR 0.91.  "As such, it has unique expertise in the area of interpreting rules promulgated by the FCC."  Ind. Bell Tel. Co. v. McCarty, 362 F.3d 378, 386 (7th Cir. 2004).

depreciation study in the record.  The Board held that the arbitrator "[a]ppropriately [gave] less weight . . . to this evidence."  (JA, Ex. 92, p. 17).  In particular, the Board held that it "agreed with the Arbitrator who found unpersuasive PRTC's claim that its depreciation rate study was vetted in a manner similar to those carriers required to participate in the FCC's service life prescription review."  (Id.).  However, on closer inspection of the arbitrator's decision, it is unclear whether this is an accurate characterization of the arbitrator's reasoning or if her reasoning was based on simply requiring the safe harbor rates to be adopted without considering PRTC's study at all.  (See JA, Ex. 85, p. 185 ("PRTC wants the rates it developed in the mid-1990's that were not part of the FCC's safe harbor determination to be given the same imprimatur as the safe harbor rates even though they are generally lower than the lowest safe harbor rates.  I reject PRTC's approach.")).

Nonetheless, even if the Board erred in failing to clarify the correct legal standard, the Board was correct in affirming the arbitrator's resulting rates.  The Board may only overturn the arbitrator's decision if the *result* is inconsistent with the statute - not the reasoning.  The First Circuit explained that when the Board delegates its authority to an arbitrator, "an arbitrated *agreement* . . . must be accepted by the Board if consistent with section 251 and 252(d), unless the local agency reasonably finds that the arbitrator's *solution* conflicts with state statutes, agency rules, or considered policy determinations . . . ."  WorldNet II, 497 F.3d at 14 (emphasis added) (original emphasis omitted; internal quotation omitted).  Here, even if the arbitrator applied somewhat faulty reasoning, PRTC makes no claim that the resulting *rates* violate the statute, and indeed, the very purpose of using safe harbor rates – as the Board did here – is that they have been determined to be TELRIC-compliant and therefore consistent with the Act.[11]  Therefore, I affirm the Board's determination on the issue

---

[11]As the Board argues, "Nothing in the law compels the Board to accept PRTC's rates; the law requires only that the adopted rates are TELRIC-compliant."  Indeed, the rules governing the Board's conduct of an arbitration stand in contrast to the FCC's arbitration procedures, which require "final offer" or "baseball arbitration" and allow the arbitrator to select a result different from that proposed in the parties' final offers only when one such offer fails to comply with the requirements of the Act or in the "unique circumstances" that a different solution would better implement the objectives of the Act.  47 CFR 51.807; Verizon Virginia, 18 FCC Rcd at 17736, ¶ 24.  Cf. 27 L.P.R.A. § 269d (b)(4)(C) (stating simply that "[t]he Board shall resolve each issue set forth in the petition and the response thereto . . . by

of depreciation inputs.

### (3)    Cost of Capital

The parties further disagree on the Board's determination of the input in the cost model for the Weighted Average Cost of Capital ("WACC").  The WACC determines the level of return to investment contained within UNE prices that an incumbent carrier is expected to earn, and is often referred to as the company's "rate of return." (Docket No. 62, p. 43).  A WACC calculation includes a determination of the "beta" factor.  Beta measures the degree to which a company's stock price varies relative to the market as a whole.  Verizon Virginia, 18 FCC Rcd at 17761, ¶ 87.  A company has a beta value of 1.0 if its stock price changes over time to an identical degree as the stock market in the aggregate changes; it has a beta value of less than 1.0 if it changes less than the market as a whole (*i.e.*, has *less* risk than the market); and it has a beta value greater than 1.0 if it changes more than the market (*i.e.*, has *more* risk than the market).  Id.  In calculating WACC, a beta value is used in order to account for the risks associated with investment in a forward-looking network that uses the most efficient technology available so that a WACC rate will be developed that encourages competitive carriers to invest in their own facilities and increase the development of facilities-based competition.  Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, 18 FCC Rcd 16978, 17396-7, ¶ 682 (2003) ("Unbundling Obligations").  However, the FCC has noted that selecting a beta value is "the most difficult aspect of the cost of capital calculation because there is no real-world company that provides UNEs in the type of competitive market assumed under the Commission's TELRIC rules, and therefore no real-world company's beta precisely reflects the risk of participating in such a market."  Verizon Virginia, 18 FCC Rcd at 17761, ¶ 87.

The arbitrator here rejected PRTC's proposed beta value, which was an average value based on a peer group of national carriers.  (JA, Ex. 85, p. 284).  The arbitrator found that the national carriers' activities included video ventures and thus were not reflective of the risk faced by PRTC,

---

imposing appropriate conditions as required to implement subsection (c) of this section  [*e.g.*, comply with the (federal) Telecommunications Act] ").

which was not implementing such a venture.  Instead, the arbitrator expressed her agreement with the FCC that "the overall beta of 1.0 for the S&P 500 companies . . . does produce a useful benchmark for the risk faced on average by established companies in competitive markets."  (JA, Ex. 85, p. 284 (quoting Verizon Virginia, 18 FCC Rcd at 17762, ¶ 90)).  The arbitrator asserted that she found this figure appropriate because "absent evidence to support the establishment of an industry beta value higher than 1.0 that would be reflective of the level of risk faced by PRTC" it was preferable to "adopt the market beta value representing the risk faced on average by competitive companies."  (Id.).  The Board held that the video deployment finding was "unsupported in the record" but nonetheless affirmed the arbitrator's beta value determination, finding that the arbitrator did not rely solely on the video deployment issue to reach her determination.  (JA, Ex. 92, p. 15).  The Board also expressed its agreement with the arbitrator's (and the FCC's) use of the S&P 500 beta value of 1.0, finding that this value "reflects the level of risk faced on average by market participating companies facing competitive markets," and concurring that the Board would "'be uncomfortable prescribing a cost of equity capital for UNEs that is based on a beta significantly higher or lower than the average beta for companies that face competition.'"  (Id. (quoting Verizon Virginia, 18 FCC Rcd at 17762, ¶ 90)).  In short, the Board concluded that the arbitrator's selection of a 1.0 beta value "was reasonable and not contrary to either law or policy."  (Id.).

PRTC challenges this beta value determination on two grounds: (1) the Board incorrectly affirmed the beta value determination even though it found that the video deployment finding was unsupported by the record, and (2) in adopting the S&P 500 beta value of 1.0, the arbitrator and Board misinterpreted and misapplied the FCC's holding in Verizon Virginia.  (Docket No. 62, p. 43-47).  Essentially, the arbitrator found that she could not adopt PRTC's proposal based on her (erroneous) view of the video-deployment issue, and in seeking an alternative figure, selected the FCC's determination from the Verizon Virginia decision as a beta value figure that had previously been approved by the FCC.  As noted previously, the Board should only overturn the arbitrator if her result is inconsistent with law or policy – not if the Board simply has a difference of opinion in the

rationale used to arrive at the ultimate result.  See WorldNet II, 497 F.3d at 14 (when the Board delegates its authority to an arbitrator, "an arbitrated *agreement . . . must* be accepted by the Board if consistent with section 251 and 252(d), unless the local agency reasonably finds that the arbitrator's *solution* conflicts with state statutes, agency rules, or considered policy determinations . . . .") (emphasis added; original emphasis omitted) (citing WorldNet I).  Moreover, the arbitrator is not required to select from among the parties' proposals, but may craft her solution so long as it is consistent with the record evidence, laws, regulations, and policy.  See note 11, supra.  Therefore, the Board was within its discretion in determining that the arbitrator's decision was not solely based on the erroneous video deployment and thus proceeding to consider whether the arbitrator's ultimate solution was correct as a matter of law and policy.

PRTC also argues that the arbitrated solution – borrowing the beta figure from Verizon Virginia – was contrary to law as expressed in that decision.   In particular, PRTC contends that in Verizon Virginia, the FCC adopted the S&P 500 beta value of 1.0 in order to *increase* the average ILEC beta to reflect the additional risk of operating in a competitive market, but here the arbitrator *reduced* the average beta.  (Docket No. 62, p. 45-46).  PRTC is correct that the FCC found that the proposed beta "likely understate[d] the risk of selling UNEs in a competitive market" and applied a beta of 1.0 rather than the proposed beta of .75.  Verizon Virginia, 18 FCC Rcd 17722, 17762-63, ¶ 89, 93.  However, PRTC's attempt to draw a distinction between the Board's decision here and Verizon Virginia is without merit.  In Verizon Virginia, the CLEC advocated a beta of .75 based on actual average betas of incumbent carriers; the ILEC proposed a higher beta (reflecting higher risk) of 1.0 based on the risk of S&P 500 companies.  Here, PRTC proposed a beta value of 1.12 based on the average betas for certain local exchange carriers; WorldNet proposed a figure (presumably lower) based on PRTC-specific information.[12]   However, a close reading of Verizon Virginia demonstrates that whether an agency uses the S&P 500 beta value to increase a CLEC's beta

_____

[12] The beta value in WorldNet's proposal is not specified in the administrative decisions or the parties' briefs.

proposal or to decrease an ILEC's beta proposal, the FCC's holding is simply that using a 1.0 beta value is "reasonable" and provides "a useful benchmark for the risk faced on average by established companies in competitive markets." Verizon Virginia, 18 FCC Rcd at 17762, ¶ 90. See also Unbundling Obligations, 18 FCC Rcd at 17396, ¶ 681 (state agencies "should establish a cost of capital that reflects the competitive risks associated with participating in the type of market TELRIC assumes"; that is, "a competitive market . . . in which . . . carriers would face the risk of losing customers to other [ ] carriers"). In short, the FCC found that a beta value of 1.0 was consistent with the requirements of the Act. Therefore, the Board's decision correctly interpreted the FCC's decision on this issue, and PRTC's challenge is without merit.

PRTC also argues that the debt-equity ratio used by the arbitrator, and affirmed by the Board, was unsupported in the record and therefore arbitrary and capricious. (Docket No. 62, p. 47). It appears that in the proceedings below PRTC proposed to the arbitrator a ratio based on an average of other national carriers (JA, Ex. 85, p. 284), and did not propose a PRTC-specific figure until the reconsideration proceeding before the Board. (See JA, Ex. 92, p. 16 ("we reject PRTC's attempts to introduce additional information that is not currently in the record")). The arbitrator thus adopted WorldNet's proposal based on PRTC-specific figures gleaned from documents regarding PRTC's sale to América Móvil as the figure that "best reflects the current debt and equity structure of PRTC." (JA, Ex. 85, p. 284). PRTC complains that these figures were outdated and could not have accurately represented its "current" capital structure. (Docket No. 62, p. 48). However, the court defers to the arbitrator's selection from among various pieces of record evidence as to which one "best reflects" the issue before her, and defers to the Board's choice not to admit additional evidence that was not before the arbitrator and accordingly affirm the arbitrator's determination. Therefore, because the arbitrator and Board reasonably relied on record evidence in making their determinations, their decisions are not arbitrary and capricious and are affirmed.

### (4)    Maintenance and Operations Factors

PRTC challenges the Board's determination of the factor to be applied in the TELRIC pricing model based on the long-run forward-looking costs of operating and maintaining the PRTC network. (Docket No. 62, p. 48).  This factor is generally determined based on a cost model that first determines the ratio of current maintenance costs to current investment, and then applies that ratio to the forward-looking investment in order to determine the forward-looking maintenance costs. Here, the arbitrator determined that figure and then further determined that PRTC's expense-to-investment ratio would change in the future, and accordingly decreased the maintenance expense value by 10%.  (JA, Ex. 85, p. 285).  PRTC challenges the Board's affirmance of the arbitrator's additional 10% decrease (not the ratio itself) as contrary to law and unsupported by record evidence. (Docket No. 62, p. 48).

PRTC cites Verizon Virginia for the proposition that because the expense-to-investment ratio is applied to the forward-looking investment figure, the result already reflects a forward-looking maintenance expense and that additional adjustments are unnecessary.  In particular, the FCC stated, "Because we apply the expense ratios to forward-looking investment, additional adjustments generally should be unnecessary unless we can anticipate with some certainty that the underlying relationship between investment and expenses will change in the future." Verizon Virginia, 18 FCC Rcd at 17781, ¶ 141.  PRTC contends that the arbitrator erred by not basing her decision on the required "certainty" that the previous ratio was "not representative of what would be expected on a forward-looking basis." Id. WorldNet contends that even if this heightened standard of "certainty" is correct, the arbitrator found that the record supported the conclusion that the expense-to-investment ratio would indeed change in the future.  Because the parties essentially agree on this legal standard (and the court does not disagree), I review whether the arbitrator's decision was arbitrary and capricious in applying this standard to the record.

The arbitrator found that the 10% reduction in forward-looking expenses was justified by the record because (1) past arbitrations had determined that PRTC's long-term plans justified a 10%

reduction in expenses; (2) there was no evidence that these long-term plans had either changed or been completed and stabilized the expense-to-investment ratio; (3) record evidence showed that productivity gains were continually being made by PRTC; and (4) PRTC's then-recent sale to América Móvil would result in additional improvements in its network and decreased maintenance expenses not captured under the current expense-to-investment ratio.  (JA, Ex. 185, p. 286).

Thus, the arbitrator relied on extensive, detailed support in the record for her determination that PRTC's expense-to-investment ratio would change in the future to a degree not captured by applying the ratio to the future investment ratio.  This reliance on record support satisfies the "certainty" standard in the <u>Verizon Virginia</u> order, and in the alternative, would satisfy an arbitrary and capricious standard under a less strict legal standard.  Accordingly, the arbitrator did not exceed her authority and the Board correctly affirmed the arbitrator's decision.  The court therefore affirms the Board's determination on this issue.

### (5)   Buried Drop Costs

PRTC also challenges the arbitrator's selection of an input to the cost model based on the cost of placing the buried wire that connects a customer's home or business to the PRTC network. (Docket No. 62, p. 51).  In the administrative proceedings, PRTC proposed a figure based on the assumption that it would place such buried wires into conduit 100% of the time; WorldNet's proposal assumed the use of conduits 10% of the time.[13]  (JA, Ex. 85, p. 292).  The arbitrator found that neither assumption was supported by record evidence, and further, that PRTC's proposal was not TELRIC-compliant because it was not the least-cost, most-efficient design.  (<u>Id.</u>).  Pursuant to Board policy requiring conduit drops only for new urban sub-divisions and developments and not in rural areas, the arbitrator determined that the cost figure should assume the use of conduit drops 25% of the time.  (<u>Id.</u>).  The Board affirmed the arbitrator, finding her solution to be a "reasonable

---

[13] "Conduit" refers to a pipe, generally made of metal, that runs along a floor or ceiling to protect the cables and prevent a burning cable from spreading through a building. Ill. Cent. Mgmt. Servs. Div. of Telecomms., <u>Glossary of Telecomms. Terms</u>,  http://www.state.il.us/cms/Telecom/Products/gloss.pdf.

compromise" that was "consistent with the Board's policy" and consistent with law and policy generally.  (JA, Ex. 92, p. 21).

PRTC challenges the Board's decision on two related grounds.  First, PRTC argues that there was simply no support in the record evidencing that the use of conduits 25% of the time was consistent with the Board's policy.  (Docket No. 62, p. 52).  Second, PRTC argues that applying the Board's policy to record evidence produces a figure of 84% conduit use.  (Id.).  I may easily dispose of PRTC's second argument.  As WorldNet points out, PRTC did not present this argument or the evidence on which it is based before the arbitrator or the Board.  (See JA, Ex. 85, p. 292; Ex. 92, p. 21).  PRTC may not make this argument for the first time before this court.  See, e.g., MCI Telecomms. Corp., 279 F. Supp. 2d at 954 ("[u]nder the provisions set forth in the Act for judicial review, it is most inappropriate for a district court to review matters which have not been fully presented to the [state board]").

As for PRTC's more fundamental argument that there was simply no support for the arbitrator's particular solution, this argument is insufficient to require this court to overturn the Board's decision.  As noted, the Board may overturn the arbitrator's result only if it is inconsistent with law or policy.  See WorldNet II, 497 F.3d at 14 ("an arbitrated agreement . . . must be accepted by the Board if consistent with section 251 and 252(d), *unless* the local agency reasonably finds that the arbitrator's solution conflicts with state statutes, agency rules, or considered policy determinations . . . .") (internal citation omitted).  Moreover, under Puerto Rico rules, the arbitrator is not required to select from among the parties' proposals, but may craft another solution that is consistent with the Act.  See note 11, supra.  Here, PRTC does not argue that the arbitrated solution is inconsistent with TELRIC principles, any other legal standard, or any relevant policies.  I find that the decision of the Board and arbitrator was not arbitrary and capricious in that it sought a compromise between the parties' positions that would be consistent with TELRIC standards and consistent with Puerto Rico policy, and I defer to the Board's decision that the decision was accordingly consistent with those standards, its own policies, and the record evidence.  The Board's

decision on this issue is therefore affirmed.

### (6)    Direct Fed Buildings

PRTC also challenges the cost model input for the costs associated with installing its equipment in "direct fed buildings." (Docket No. 62, p. 52). This term refers to buildings in which the cables from the network go directly into the end-user's building and must be connected to PRTC equipment inside the building. (Id.). The arbitrator found that although there was evidence that PRTC's practice was to always terminate its connection at the customer's premises with PRTC-owned equipment, or "terminals", there was no evidence that this practice was consistent with the TELRIC least-cost, most-efficient design practice. (JA, Ex. 85, p. 292). The arbitrator found that WorldNet's proposed 15% reduction to PRTC's figure was a "reasonable estimate" of the appropriate frequency of the use of PRTC termination equipment that would be TELRIC compliant. (Id., p. 292-93). The Board affirmed the arbitrator's decision over PRTC's objection that WorldNet's proposed 15% reduction did not include any support in the record. (JA, Ex. 92, p. 22). The Board found that while it was undisputed that PRTC's current practice was to terminate 100% of its cables in PRTC-owned terminals, there was not sufficient support showing that this practice was consistent with forward-looking cost principles. (Id.). The Board found the arbitrator's decision reasonable and consistent with law and policy, and affirmed. (Id.).

PRTC argues here that there was no support in the record for the arbitrator's determination that terminating all cables in PRTC-owned terminals was inconsistent with forward-looking cost principles, and no support for her determination that a 15% reduction was consistent with TELRIC principles, noting that the arbitrator's decision did not include any record or legal citations. (Docket No. 62, p. 53). Nonetheless, PRTC's argument once again challenges the arbitrator's *process*, and does not contend that the ultimate solution she crafted violated any law or policy. See WorldNet II, 497 F.3d at 14 (when the Board delegates its authority to an arbitrator, "an arbitrated *agreement* . . . *must* be accepted by the Board if consistent with section 251 and 252(d), unless the local agency reasonably finds that the arbitrator's *solution* conflicts with state statutes, agency rules, or considered

policy determinations . . . .") (emphasis added) (original emphasis omitted; internal quotation omitted).  Here, PRTC did not suggest that the arbitrated "solution" violated the Act or any other law or policy, and thus the Board correctly adopted that determination and its decision is affirmed.

### (7)    Structure Sharing

PRTC also challenges the Board's decision on the issue of structure sharing.  "Structure sharing" refers to how much of the cost of installing poles, digging trenches, and placing conduit would be shared on a forward looking basis by the incumbent carrier with other entities, such as power companies, cable operators, and other telecommunications carriers.  Rules Regarding the Pricing of Unbundled Network Elements, 18 FCC Rcd 18945, 18970, ¶ 71 (2003) (notice of proposed rulemaking) ("UNE NPRM").  The more sharing that is assumed, the lower the cost to the incumbent carrier, and thus the lower the cost that is reflected in interconnection agreements with competitive carriers.  Id. at 18970-71, ¶ 71.  Here, the arbitrator rejected PRTC's proposed term reflecting no sharing of buried and underground structures, instead holding that TELRIC principles require an assumption of at least some sharing and, accordingly, adopted WorldNet's proposal. (JA, Ex. 85, p. 287).  PRTC argued before the Board that the arbitrator had disregarded PRTC's evidence that it had been unable to share these structures, but the Board found that the arbitrator had considered these facts and "weighed this evidence appropriately."  (JA, Ex. 92, p. 18).  Moreover, the Board agreed that PRTC's claim that it "will never share copper structure because it has been unable to coordinate with other utilities in the past does not reflect forward-looking principles." (Id.).  Accordingly, the Board affirmed the arbitrator's decision.  (Id.).

PRTC now challenges the Board's decision on the ground that the Board erred as a matter of law in finding that PRTC's non-sharing proposal did not reflect TELRIC principles. (Docket No. 62, p. 55).  The Board relied on the FCC's decision in Verizon Virginia, adopting WorldNet's proposed sharing assumptions both because they "appear reasonable" and because they are the same assumptions used by the FCC in Verizon Virginia. (JA, Ex. 85, p. 287-88 (citing JA, Ex. 51, p. 35; Verizon Virginia, 18 FCC Rcd at 17834, ¶ 288)).  However, a close reading of Verizon Virginia

cautions that the FCC's determinations may not be applicable here because the FCC's decision was heavily dependent on the specific facts before it, and also because it was a product of the FCC's "baseball arbitration" practice of adopting the final proposal of one side or the other, not crafting a decision that the agency found to best implement the law and policy.  See 18 FCC Rcd at 17833, ¶ 287 (noting that both parties' proposals are "unsupported by actual documentation" but the agency is "left to choose" between them).

Most helpful to figuring out the law on this issue is the FCC order on which Verizon Virginia relied, Federal-State Joint Board on Universal Service, 14 FCC Rcd 20156, 20262, ¶¶ 245-247 (1999) ("Inputs Order").[14]  In the Inputs Order, the FCC found that "a forward-looking mechanism must estimate the structure sharing opportunities available to a carrier operating in the most-efficient manner."  Id., ¶ 247.  Accordingly, "the forward-looking practice of a carrier does not necessarily equate to the historical practice of the carrier" and as a result, even if the commission "had accurate and verifiable data with respect to the incumbent LEC's existing structure sharing percentages, we would still need to decide whether or not those existing percentages were appropriate starting points for determining the input values for the forward-looking cost model."  Id., ¶¶ 245, 247.  Accordingly, the FCC adopted universal percentages ranging from 55-100% (reflecting the ILEC sharing 0-45% of underground costs with other carriers).  Verizon Virginia, 18 FCC Rcd at 17833-34, ¶ 288 (citing Inputs Order, 14 FCC Rcd at 20262, ¶¶ 243-248).

Thus, the Inputs Order provides examples of structure sharing percentages that the FCC found "reasonable".  Inputs Order, 14 FCC Rcd at 20263, ¶ 249.  However, these percentages are not requirements.  Verizon Virginia shows that the FCC would have preferred to rely on record

---

[14] PRTC contends that there is no settled law emanating from the FCC on structure sharing, noting that the FCC has not issued any rules on the issue subsequent to its notice of proposed rulemaking in which the FCC requested suggestions on how it could provide guidance on the "difficult" issue of structure sharing.  UNE NPRM, 18 FCC Rcd at 18971, ¶ 71.  However, my review of the Inputs Order and Verizon Virginia has convinced me that there is indeed law on the issue which is binding on the Board and to which this court defers as it is the result of the FCC interpreting its own statute, even if that law is subject to change if and when the FCC issues rules on the issue.

evidence but because both parties put forth proposals "unsupported by actual documentation," the FCC relied on the Inputs Order as "the only independent evidence of forward-looking structure sharing values available to us to evaluate the parties' . . . proposals." 18 FCC Rcd at 17833, ¶ 287. In short, the FCC would have preferred to rely on "actual documentation" from the parties, but turned to the Inputs Order in the absence of such evidence.

Taken together, these FCC orders demonstrate that: (1) structure sharing assumptions should be forward looking; (2) forward looking assumptions may differ from historical practice; and (3) the state board should consider the record evidence before it, and such evidence may show that even in a forward-looking model, structure sharing is not possible in some cases. Inputs Order, 14 FCC Rcd at 20262, ¶ 247. See also Verizon Virginia, ¶ 288.

The question is whether the Board properly applied this legal framework to the facts before it. First, the arbitrator appeared to assume that the forward-looking TELRIC principles require an arrangement that includes structure sharing, and preclude a result that does not include sharing. (JA, Ex. 85, p. 288 ("PRTC's claim that it will never share underground and buried facility does not reflect the views of the FCC regarding TELRIC principles.")). The arbitrator does not appear to have considered the evidence of PRTC's historic inability to create sharing arrangements and accordingly determined whether or not that historic evidence would lead to a similar inability in the future. The Inputs Order requires the Board to make just such a determination: "we would still need to decide *whether or not* those existing percentages were appropriate starting points for determining the input values for the forward-looking cost model." 14 FCC Rcd at 20262, ¶ 245 (emphasis added). In other words, the FCC allows that those historic percentages *may* be accurate starting points, while the arbitrator appears to have ruled out this possibility entirely. While the Board asserts that the arbitrator considered PRTC's evidence and "weighed [it] appropriately," it is unclear from reading the arbitrator's or the Board's decision that this assertion is accurate. More to the point, the Board proceeds to assert that PRTC's claim that it has been unable to create sharing arrangements "does not reflect forward-looking principles." (JA, Ex. 92, p. 18). These assertions by the arbitrator and

Board appear to dismiss the possibility that a practical inability to create sharing arrangements in the future could be consistent with TELRIC principles. This conclusion is not supported by FCC precedent. Instead, the Board should consider whether in the Puerto Rico context, future structure sharing is possible, allowing for the possibility that even in a forward-looking model, sharing may not be possible. The Board may determine that based on the facts before it, PRTC's existing sharing percentages are not appropriate starting points, but it must allow for the possibility that they are appropriate. See 14 FCC Rcd at 20262, ¶ 245 ( "we would still need to decide *whether or not* those existing percentages were appropriate starting points"). Therefore, I conclude that this issue must be remanded to the Board for further consideration consistent with this opinion.

### (8)     Cable Sizes

PRTC challenges the Board's determination of the cost figure based on "cable size." The cable size figure determines the total quantity of cables in a forward-looking, efficient, least-cost network. The arbitrator found that PRTC's proposal "overstates smaller cable sizes" and that PRTC did not adequately explain how it derived its proposed figures. (JA, Ex. 85, p. 290). Finding that PRTC had failed to sufficiently dispute WorldNet's proposal, the arbitrator adopted WorldNet's proposed cable size figures. (Id.). PRTC challenged this determination, arguing that the arbitrator's result did not produce a sufficient amount of cable for the network. (JA, Ex. 105, p. 5). Affirming the arbitrator, the Board determined that PRTC's proposal could not be used "consistently with the requirements of the Act." (Id., p. 6). In particular, the Board found that assumptions in PRTC's proposed model were "not realistic" and not supported by sufficient evidence.[15] (Id., p. 7). The Board noted that "PRTC's only defense of its assumption is that it produces a total cable requirement that is lower than what is on the books." (Id.). The Board stated it was "forced to choose between robust inputs and reasonable outputs," and accordingly chose the "better forward-looking inputs" because "only by focusing on the inputs can we be assured that our actions are consistent with the

---

[15] The assumption at issue was part of the "tapering algorithm" and assumed that "all lines are eventually served by a 50 pair cable." (Id.).

Act and FCC rules."  (Id.).

PRTC now contends that this choice was an error of law, arguing that the law requires the Board to focus on the results, not the methodology, of the arbitrator's rate setting. (Docket No. 62, p. 56).  In support of its proposition, PRTC cites Federal Power Commission v. Hope Natural Gas Co. for its holding that when Federal Power Commission ("FPC") rate-making is challenged in federal court, "[u]nder the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling." 320 U.S. 591, 602 (1944).  That analysis, as suggested by the text, was based on the statutory requirement of the Natural Gas Act of 1938 that all gas rates set by the FPC "shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful."  Id., 320 U.S. at 600 (citing 15 U.S.C. § 717).  In the context of the Telecommunications Act of 1996, however, a "just and reasonable" rate has been defined quite differently from its definition in Hope Natural Gas.

The 1996 Telecommunications Act provided that a state board's determination of a "just and reasonable" rate shall be "based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the interconnection or network element." 47 U.S.C. § 252(d)(1). As the Supreme Court has explained, the FCC, in its discretion, "chose a way of treating 'cost' as 'forward-looking economic cost,' something distinct from the kind of historically based cost generally relied upon in valuing a rate base after Hope Natural Gas." Verizon Commc'ns, Inc., 535 U.S. at 495 (citing 47 CFR § 51.505).   Thus, the rate-setting requirements of the 1996 Telecommunications Act are defined in contrast to those of the 1938 Natural Gas Act, making Hope Natural Gas a problematic source of support.   Bearing that distinction in mind, the Board's decision here to ensure that the inputs for the rate-setting algorithm were properly forward-looking in compliance with federal regulations appears eminently reasonable and consistent with law.  (See JA, Ex. 105, p. 8 (choosing to focus on "forward-looking inputs" in order to "be assured that our actions are consistent with the Act and FCC rules)).

Nevertheless, the Supreme Court has emphasized that certain principles of Hope Natural Gas have lasting value. Duquesne Light Co. v. Barasch, 488 U.S. 299, 310 (1989). In particular, the Supreme Court has "reaffirm[ed] these teachings of Hope Natural Gas: [I]t is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unreasonable, judicial inquiry . . . is at an end. The fact that the method employed to reach that result may contain infirmities is not then important." Id. (citing Hope Natural Gas, 320 U.S. at 602). See also Verizon Commc'ns, Inc., 535 U.S. at 525 ("[t]he fact that the method employed to reach [just and reasonable rates] may contain infirmities is not . . . important . . .the general rule is that any question about the constitutionality of rate setting is raised by rates, not methods"). However, the Court's emphasis on focusing on the rates rather than the methods is directed at federal courts, not, as PRTC contends, to administrative agencies themselves. Indeed, the very purpose for this focus is that an agency order "is the product of expert judgment which carries a presumption of validity," and therefore, a plaintiff challenging the rate-setting order "carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." Hope Natural Gas, 320 U.S. at 602. This "presumption of validity" is the predecessor to the more modern Chevron deference that courts grant agencies in the interpretations of their own statutes. See Verizon Commc'ns, Inc., 535 U.S. at 541-42 (Breyer, J., dissenting) ("[a]s a reviewing court, . . . we must assume that Congress intended to grant the [FCC] broad legal leeway in respect to the substantive content of the rules, particularly since the subject matter is a highly technical one, namely rate making, where the agency possesses expert knowledge" (citing Hope Natural Gas, 320 U.S. at 602; Chevron, U.S.A., Inc., 467 U.S. at 842)). To that end, the reason that federal courts must focus on final rates rather than rate-setting methodologies is because "it was the very point of Hope Natural Gas that regulatory bodies required to set rates expressed in these terms [i.e., 'just and reasonable'] have ample discretion to choose methodology." Verizon Commc'ns, Inc., 535 U.S. at 500 (citing Hope Natural Gas, 320 U.S. at 602).

The cases cited by PRTC make clear that *this court* must focus on the Board's result, not the Board's process.  However, a closer look at PRTC's arguments reveals that its only argument about the Board's result is a challenge to the reasonableness and evidentiary support for the arbitrated solution.  (See Docket No. 62, p. 57-59 ("[t]he end result . . . [is] incapable of serving the customers currently using the PRTC network"; the Board's methodology  "produced an unreasonably small amount of cable"; the arbitrator's solution "produced a network with insufficient cable to connect and serve all current customers on the island of Puerto Rico")).  Likewise, PRTC's challenge to the arbitrator's decision in its motion for reconsideration by the Board equally focused on the weighing of evidence and other discretionary factors in her decision and did not include a challenge to the result of her rate-setting.  PRTC challenged the arbitrator's decision on the basis that (1) PRTC's assumption was consistent with evidence as to PRTC's actual network; (2) the results of WorldNet's methodology produced a cable amount "plainly inadequate"; (3) further errors in WorldNet's methodology result in an "overstatement in the number of large cables"; and (4) PRTC's assumption "reasonably approximates a typical network."  (JA, Ex. 105, p. 5).  In its second motion for reconsideration, PRTC argued that (1) the Board should have relied on the Metro Loop Length Study in addition to the Isla Loop Length study; (2) the Board wrongly believed that PRTC used 4, 5, and 6 route directions in areas that serve less than 20 lines; (3) the Board's finding "completely ignores Puerto Rico's high population density"; and (4) it is "plainly unreasonable" not to consider the outcome of rejecting PRTC's assumption when "the effect is an aggregate length figure significantly lower than the figure in the current network and insufficient to serve the entire island of Puerto Rico" and therefore "produce[s] unreasonable and arbitrary results."  (JA, Ex. 113, p. 13-14).  These arguments do not ask the Board to find that "the arbitrator's *solution* conflicts with state statutes, agency rules, or considered policy determinations", but rather challenge the arbitrator's solution with regard to weighing of evidence.  WorldNet II, 497 F.3d at 14.

As repeated throughout this decision, the Board is required to focus on the arbitrator's result, not the arbitrator's process.  See WorldNet II, 497 F.3d at 14 (when the Board delegates its authority

to an arbitrator, "an arbitrated *agreement . . . must* be accepted by the Board if consistent with section 251 and 252(d), unless the local agency reasonably finds that the arbitrator's *solution* conflicts with state statutes, agency rules, or considered policy determinations . . . .") (emphasis added) (original emphasis omitted; internal quotation omitted).  PRTC did not challenge the arbitrator's decision on any of these enumerated grounds, and the Board found it consistent with law and policy.  Therefore, the Board was correct in affirming the arbitrator's solution over PRTC's challenges.

PRTC's challenges here do not allow this court to engage in a *de novo* review of the law, as PRTC urges, because PRTC's challenges focus on the weighing of evidence and other matters entrusted to the Board and arbitrator.  For the reasons expressed by the Supreme Court in Hope Natural Gas and, more recently, in Verizon Communications, Inc., this court must focus on legal challenges to the Board's results, not to its methodology.  PRTC has not attacked the Board's results as a matter of law or abuse of discretion, and therefore the court affirms the Board's determination as to cable sizes.  See Hope Natural Gas, 320 U.S. at 602 ("If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end.").

### (9)    Fiber Structure Costs

### (a)    Trenching and Excavation

PRTC also challenges the Board's decision on fiber structure costs as it relates to the use of trenching and excavation for fiber placement.[16]  (Docket No. 62, p. 60).  In determining this element, the Board considered PRTC's proposal to rely on excavation for fiber placement one hundred percent of the time, and WorldNet's proposal to rely on trenching one hundred percent of the time. (JA, Ex. 105, p. 11).  The Board heard evidence that trenching is less costly than excavation, but excavation is safer, can be used in different soil types, and can dig a wider trench.  (JA, Ex. 113, p. 6, n.11).  The Board also heard evidence that other carriers use a mixture of the two methods, that PRTC has historically used trenching as a method in its network construction, and that both are

---

[16] As best as the court is able to determine from its review of the administrative record and briefs on this motion, the arbitrator did not render a decision on the specific issue of trenching and excavation.

accepted methods with upsides and downsides depending on the circumstances, (JA, Ex. 113, p. 6, n. 13). Based on this evidence, the Board found that "neither [party's] extreme position is correct." (JA, Ex. 105, p. 11). Rather, in a forward-looking, least cost, most-efficient network, some mixture of trenching and excavation should be used. (Id.). Since the Board had no evidence before it of the precise balance between the two methods in the TELRIC-compliant network, the Board "appl[ied] Solomonic judgment to the issue" and simply split the two proposals, ordering a cost figure based on the use of each trenching and excavation fifty percent of the time. (Id.).

PRTC contends that this result is arbitrary and capricious because there is no support in the record for the proposition that PRTC currently uses, or should use in a forward-looking network, trenching fifty percent of the time. (Docket No. 62, p. 61). However, this is not an accurate characterization of the Board's decision. As described above, the Board's decision was based on various sources of evidence showing that there are "upsides and downsides" to both methods as to cost, safety, and usefulness, that other carriers use a mix of the two methods, and that PRTC has previously included trenching in its network construction. (JA, Ex. 113, p. 6). The Board supported each of these propositions with citations to record evidence. (Id., n.11, n.12, n.13). In short, the Board found that there was no evidence supporting either party's proposition that one method or the other should be used one hundred percent of the time, but there was also no evidence demonstrating the proper, precise ratio that should be used in a forward-looking network. (JA, Ex. 105, p. 11). Therefore, the Board exercised its judgment and discretion to determine a value for this figure, and in the absence of any proposals supported by the record, simply split the difference between the parties' diametrically-opposed "extreme positions". (Id.). This decision was reasonable and supported by record evidence, and thus was neither arbitrary nor capricious. Therefore, the Board's decision on this issue is affirmed.

### (b)    Paving

In the Ninth Cause of Action in its amended complaint, WorldNet challenged another aspect of the Board's fiber structure cost determination (the "paving issue"). (Docket No. 50, p. 15). While

the Board moved for summary judgment on the paving issue (Docket No. 60, p. 60), WorldNet did

not address this issue in either its own motion for summary judgment or in its opposition to the

Board's motion.  (Docket Nos. 62, 74).  In fact, in addressing PRTC's challenge to other aspects of

the fiber structure cost determination, WorldNet was silent about its own challenge and instead

asserted that the "Board made no reversible error in establishing the input for fiber structure."

(Docket No. 74, p. 55).  Therefore, the court deems WorldNet to have waived its Ninth Cause of

Action and grants summary judgment for the Board affirming its decision on the paving issue.

### (10)    Non-Recurring Charges

### (a)    Fall-Out Percentage

The arbitrated leasing rates include both recurring charges for WorldNet's use of PRTC's

network elements over an extended time period as well as non-recurring charges for one-time

activities performed by PRTC for WorldNet associated with ordering a service and provisioning that

service.  (Docket No. 62, p. 62).  See also Sprint Commc'ns. Co. v. FCC, 274 F.3d 549, 557 (D.C.

Cir. 2001) (defining non-recurring charges).  The dispute here involves the "fall-out" percentage

included in the non-recurring charges.  As the D.C. Circuit explained the issue, "[e]ven with the best

technology available, each stage in the automatic [service ordering] processes may fail requiring

more expensive manual intervention.  When this occurs, a service order is said to 'fall out.'" Id.  The

cost of manual intervention is much higher than automatic processing.  The issue here concerns the

rate that WorldNet pays PRTC for non-recurring ordering and pre-ordering charges, and how the

"fall-out" factor will affect that rate.  The arbitrator held that PRTC would charge for service orders

only in those instances when an electronic order actually falls out of the system and must be

processed manually.  (JA, Ex. 105, p. 20).  The Board overruled the arbitrator and reconsidered the

"fall-out factor" in its follow-on proceedings, where it determined that the non-recurring charge

should assume a fall-out percentage of two-percent, rather than including a specific charge for each

instance that an order actually falls out of the system.  (JA, Ex. 113, p. 22).

PRTC challenges board's non-recurring cost determination on multiple grounds.  First, PRTC argues that the decision was a legal error because it violates FCC mandate in departing significantly from PRTC's actual practice.  Second, PRTC contends that the Board was arbitrary and capricious in relying on WorldNet witness Steven E. Turner because he had no first-hand knowledge of PRTC's systems.  Third, PRTC argues that the Board was arbitrary and capricious in requiring PRTC to provide evidence of the costs that would be necessary to upgrade its systems.

Before PRTC's arguments can be addressed directly, the procedural posture of the Board's decision must be considered.  This was an issue on which the Board overruled the arbitrator.  As noted, the Board may overrule the arbitrator only where the Board finds the arbitrator's solution inconsistent with the Act or if the Board "reasonably finds that the arbitrator's solution conflicts with state statutes, agency rules, or considered policy determinations."  WorldNet II, 497 F.3d at 14.  Here, the Board overruled the arbitrator because it found that (1) the arbitrator's solution "created incentives to operate inefficiently"; and (2) in a forward-looking network, establishing a fall-out percentage "is more consistent with the Act."  (JA, Ex. 113, p. 21).  While the court would have preferred the Board's legal reasoning to be stated less equivocally, I will assume for the purposes of this analysis that the Board found the arbitrator's decision to be *inconsistent* with the Act.  Because PRTC asks this court to consider the law *de novo*, the question of whether the Board properly overruled the arbitrator and whether the Board applied the correct law in its own determination require the same analysis.

The Board found that TELRIC principles required it to "assume that service ordering and provisioning systems are efficiently designed, operated and maintained so as to virtually eliminate manual processing caused by system errors."  (JA, Ex. 113, p. 22).  Further, the Board found that applying a fall-out percentage was more consistent with TELRIC principles than "accept[ing] the limitations of the legacy PRTC system, as apparently the Arbitrator did."  (Id.).  PRTC contends that this decision was inconsistent with FCC directives, but a close reading of the FCC order cited by PRTC actually supports the Board's position.

PRTC cited the FCC's UNE NPRM for reflecting the FCC's "concern that network assumptions that depart significantly from an incumbent LEC's existing network might preclude recovery of the cost of non-recurring activities that would be required in establishing a competitive market." 18 FCC Rcd at 18984, ¶ 117.  PRTC contends that this statement requires the Board to ensure that its "network assumptions" as to fall-out percentages do not "depart significantly" from PRTC's actual systems, and that the Board was therefore incorrect as a matter of law in applying a rate based on a hypothetical forward-looking network, rather than on PRTC's own system.  (Docket No. 62, p. 63-64).  However, PRTC mischaracterizes the FCC's guidance on this issue.  First, the UNE NPRM was a notice of proposed rulemaking, and the FCC has not issued any resulting rules to date.  However, to the extent that the UNE NPRM has any instructive value for courts, it is precisely the opposite of what PRTC asserts.

In the UNE NPRM, the FCC first observed that determining non-recurring costs was a "constant source of dispute" in state proceedings. 18 FCC Rcd at 18984, ¶ 116.  The FCC explained both sides of this dispute.  On one side was the view that state boards should assume a forward-looking network in calculating non-recurring costs, and on the other side was the view that commissions should use assumptions that more closely reflect the actual costs incurred in the existing network.  Id.  The FCC observed that its own "rules suggest" the former view, citing the requirement in 47 C.F.R. § 51.507(e) that "[n]on-recurring charges . . . shall not permit an incumbent LEC to recover more than the total forward-looking cost of providing the applicable element."  Id., n.157.  Beyond this legal justification for the former view, the FCC emphasized that state boards used just such a TELRIC-based consideration in determining recurring charges and expressed its policy view that "[w]e believe that consistency among the various components of rates is important." Id., ¶ 116-17.  The FCC proceeded to explain the justification for the latter view, stating, "[n]evertheless, we are sensitive to the practical concern that network assumptions that depart significantly from an incumbent LEC's existing network might preclude recovery of the cost of non-recurring activities that would be required in establishing a competitive market." Id., ¶ 117.  Finally,

the FCC requested that parties address which view should be applied in the non-recurring cost context.

Accordingly, the UNE NPRM expresses the FCC's view that a forward-looking assumption in non-recurring costs was consistent with the FCC's rules, but an assumption based on the existing network might have "practical" benefits.  Id., ¶ 117.  Because the FCC has not issued any further guidance on the matter, the law as it currently stands requires a state board to apply a forward-looking assumption to non-recurring costs, consistent with the FCC's rules.  See id., ¶ 116 (citing 47 C.F.R. 51.507(e)).  Therefore, the Board was correct in its interpretation of the law as requiring it to overturn the arbitrator in order to apply TELRIC principles to its calculation of the non-recurring charge.

PRTC also challenges the Board's admission of testimony by WorldNet's expert witness, Mr. Turner.  PRTC contends that his testimony was improperly admitted because he lacks expertise concerning PRTC's operations support systems.  For the purposes of this analysis, the court will assume, as PRTC urges, that certain evidentiary rules govern the admission of expert testimony in administrative proceedings.  See Niam v. Ashcroft, 354 F.3d 652, 660 (7th Cir. 2004) (although the Federal Rules of Evidence and Daubert do not apply in administrative proceedings, "the spirit of Daubert . . . does apply" because "'[j]unk science has no more place in administrative proceedings than in judicial ones" (citing Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993))).[17] Nonetheless, it follows from the foregoing analysis that Mr. Turner was not required to be an expert on PRTC's systems because the Board was correct in establishing a rate based on a forward-looking, least cost, most efficient system rather than on PRTC's own system specifically.

The Board correctly admitted Mr. Turner for the purpose of testifying about this TELRIC-

---

[17] Daubert, as codified in Federal Rule of Evidence 702, requires a district court, prior to admitting expert testimony based on "scientific, technical, or other specialized knowledge" to determine whether "(1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.

compliant, forward-looking system.   The Board rejected PRTC's challenge to Mr. Turner's testimony, finding instead that Mr. Turner's testimony "was based on his experience and his expertise and consisted of an extensive discussion of fall-out percentages and TELRIC principles." (JA, Ex. 113, p. 22).  Further, applying the "spirit of <u>Daubert</u>", <u>Niam</u>, 354 F.3d at 660, the Board noted that "Mr. Turner is a frequent witness on these and similar matters before state regulatory commissions" and that the Board "found his discussion of the benefits of a low fall-out percentage to be compelling."  (<u>Id.</u>).  <u>See also</u> Fed. R. Evid. 702 (testimony of witness "qualified as an expert by knowledge, skill, experience, training, or education," may be admitted where it "will assist the trier of fact to understand the evidence or to determine a fact in issue").   Thus, the Board did not abuse its discretion in relying on Mr. Turner's testimony.  Therefore, the court finds that PRTC's challenge to the "fall-out" percentage included in the non-recurring cost element is without merit, and the Board's decision on this issue is affirmed.[18]

**(b)     Dispatch Occurrence Frequency**

PRTC's complaint references a second aspect of the non-recurring cost determination: dispatch occurrence frequency.  (Docket No. 51, ¶ 74-79).  While the Board moved for summary judgment on both fall-out rates and dispatch occurrence frequency (Docket No. 60, p. 74), PRTC's motion and opposition to the Board's motion discuss only the issue of fall-out percentage.  (Docket Nos. 62, p. 62; 75, p. 47).  Therefore, the court deems PRTC to have waived any challenge to the issue of dispatch occurrence frequency and grants summary judgment for the Board, affirming its decision on the issue of dispatch occurrence frequency.

---

[18] PRTC also complains that the Board "criticized" PRTC for failing to provide certain evidence. First, it is unclear to the court that this issue was integral to the Board's decision.  Thus, even if the court were to find that the Board was indeed arbitrary and capricious in "criticiz[ing]" PRTC for failing to provide the evidence, it is unclear that such a finding would require the court to overturn the Board's decision.  Moreover, PRTC's three sentences on this matter do not satisfy its burden of sufficiently developing its claims.  <u>See</u> <u>Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. Kg.</u>, 295 F.3d 59, 67 (1st Cir. 2002) ("[a] party advancing a legal claim must make a respectable effort to argue it, supplying pertinent authorities or accounting for their lack. At least where the proposition is open to doubt, it is not enough to assert it and hope the court will do the research") (internal citation omitted).

### (11)    Rates for Local Loops

PRTC includes a section in its brief challenging the Board's determination of rates for "loops". (Docket No. 62, p. 67-69).  However, PRTC does not include a single citation to the decisions of the Board or arbitrator that would allow the court to locate and review the decisions that PRTC seeks to overturn, and the court is unable to locate the Board's discussion of this issue among any of the myriad Board orders included in the Joint Appendix.[19]

Nevertheless, even if this issue were properly considered in this motion, PRTC's arguments are without merit.  PRTC again argues that the Board, in violation of Hope Natural Gas, failed to consider PRTC's evidence that the results of its pricing analysis were "unreasonable" because the Board chose instead to focus on the methodology and inputs, rather than the final costs, of its analysis.  Even assuming that this is an accurate characterization of the Board's reasoning and determination – and I have to take PRTC's word for it since they did not direct me to the portion of the Board's order they are challenging – PRTC's argument would fail.  As discussed previously, the Supreme Court's emphasis in Hope Natural Gas that administrative challenges should focus on results rather than methodology was a direction to federal courts reviewing administrative decisions. Administrative agencies, on the other hand, are given wide latitude in exercising their discretion to choose a proper methodology.  See Verizon Commc'ns, Inc., 535 U.S. at 500 ("it was the very point of Hope Natural Gas that regulatory bodies required to set rates . . . have ample discretion to choose methodology" (citing Hope Natural Gas, 320 U.S. at 602)).  Here, the Board's methodology is precisely what PRTC challenges, arguing that its methodology was improper because it focused on inputs rather than outputs.  However, this court must focus on the legality of the ultimate cost determinations, and PRTC's only challenge to them is that they are "unreasonable."  The court may view the "reasonableness" of the Board's determinations only under an arbitrary and capricious

---

[19] The court has not identified any discussion of this issue (as best as the court can make sense of the issue based on the discussion in the parties' briefs) in the portion of the arbitrator's report devoted to "Individual UNE Pricing Issues." (JA, Ex. 85, p. 283-209).  Moreover, the issue is not mentioned or cited directly in PRTC's complaint.

standard, and nothing in PRTC's argument suggests that the Board acted arbitrarily and capriciously.

Therefore, for the fundamental reason that PRTC failed to provide any citation to the administrative decision it challenges, and because the substance of its argument is without merit, PRTC's challenge to the Board's decision as to local loop rates fails and Board's decision is affirmed.

## CONCLUSION

For the reasons stated above, the court concludes as follows:

As to the following issues, the Board's decision is **AFFIRMED**:

a.      Liquidated damages;

b.      Performance standards;

c.      Mixed bundles;

d.      OSS access (download, upload, and batches OSS access);

e.      OSS access (access to OSS systems interfaces);

f.      Transit traffic rates;

g.      Depreciation inputs;

h.      Cost of capital;

i.      Maintenance and operations factors;

j.      Buried drop costs;

k.      Direct fed buildings;

l.      Cable sizes;

m.      Fiber structure costs (trenching versus excavation);

n.      Fiber structure costs (paving);

o.      Non-recurring rates (fall-out rates);

p.      Non-recurring rates (dispatch occurrence frequency); and

q.      Rates for local loops.

**WorldNet Telecomms. v. Telecomms. Regulatory Board of Puerto Rico, et al.**          Page 72
Civil No. 08-1360 (FAB/BJM)
**OPINION AND ORDER**

As to the following issues, the Board's decision is **VACATED** and the arbitrator's decision is reinstated:

    a.       Collocation construction schedule;

    b.       NID and block terminal costs;

    c.       Circuit demand; and

    d.       Value of land.

As to the following issues, the Board's decision is **VACATED** and the matter is **REMANDED** for further proceedings consistent with this opinion:

    a.       Transit traffic;

    b.       Collocation construction;

    c.       Collocation price quotation response; and

    d.       Structure sharing.

**IT IS SO ORDERED**.

At San Juan, Puerto Rico, on this 25th day of August, 2009.

*S/Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge